Judy HARRISON, Plaintiff,

v.

UNITED STATES of America,
Defendant.

No. 81–2562H.

United States District Court,
W.D. Tennessee, W.D.

May 19, 1987.

Clifford J. Shoemaker, Vienna, Va., James E. Thompson, Memphis, Tenn., for plaintiff.

Joe Dycus, Asst. U.S. Atty., Memphis, Tenn., for defendant.

## MEMORANDUM AND ORDER GRANTING JUDGMENT TO PLAINTIFF

HORTON, Chief Judge.

Mrs. Judy Harrison, plaintiff, sued the United States pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b), 2671 *et seq.*, to recover for injuries she suffered as a result of the National Swine Flu Immunization Program, 42 U.S.C. Section 247b. The parties stipulated the Swine Flu vaccine caused the injuries suffered by Mrs. Harrison and that the United States is legally liable to her for her injuries. *See, In re Swine Flu Immunization Products Liability Litigation,* MDL Docket No. 330, Misc, No. 78–0040, (D.D.C.1978). Mrs. Harrison's injuries are the result of her contracting what is medically known as Guillain-Barre Syndrome (GBS). This af-

fliction was the direct and proximate result of her receiving the Swine Flu Vaccine. The main issue before the Court is that of what reasonable damages Mrs. Harrison should recover from the United States to compensate her for her injuries, the losses she suffered as a result of those injuries, the pain, and permanent disabilities resulting to her from GBS.

In order to fully dispose of this issue, the Court must determine whether Mrs. Harrison should be permitted to amend her complaint to claim money damages in excess of the $300,000.00 she claimed when she filed her administrative claim with the Public Health Service on May 1, 1978. Mrs. Harrison claims she should be granted leave of Court to amend her complaint to claim damages in excess of $1,000,000.00. She bases her claim upon newly discovered evidence not reasonably discoverable when she presented her claim to the Public Health Service. The United States moved the Court for an order denying Mrs. Harrison's motion to amend her complaint because she failed to show newly discovered evidence not reasonably discoverable at the time she presented her claim to the Public Health Service.

After a full and complete trial, based upon all of the evidence presented, and upon the entire record, the Court finds Mrs. Harrison's motion to amend her complaint should be granted. She has demonstrated to the Court and shown by expert medical proof newly discovered evidence which was not reasonably discoverable by her when she presented her claim to the Public Health Service on May 1, 1978. The newly discovered evidence shows that Mrs. Harrison suffers the disabling effect of 1) post traumatic stress syndrome, 2) synkinesia, and 3) external sphincter dyssynergia and a neurogenic bladder disorder. The Court finds that Mrs. Harrison could not have known when she submitted her claim to the Public Health Service on May 1, 1978, that years later she would suffer these disabling physical conditions. In addition, she has supported her allegations by proof of intervening facts relating to the amount of her claim. This abundant proof, the Court finds, entitles her to come within the exception provided by 28 U.S.C. § 2675(b) which reads:

(b) Action under this section shall not be instituted for any sum in excess of the amount of the claim presented to the federal agency, except where the increased amount is based upon *newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts, relating to the amount,* of the claim. (Emphasis added).

The Court, after a full consideration of all of the evidence adduced and the issues presented will award Mrs. Harrison judgment against the United States in the sum of $645,786.76. The reasons supporting the Court's judgment are stated in this memorandum and order.

*Background*

Although the Court is concerned only with the issue of damages in this lawsuit, a background statement narrating events leading up to and occurring after this lawsuit was filed may be helpful to an understanding of the issues presented to the Court and how those issues are resolved by the Court.

Mrs. Harrison participated in the National Swine Flu Immunization Program on October 13, 1976, at the City Hall, Memphis, Tennessee. She was given a swine flu inoculation by an employee of the Memphis and Shelby County Health Department. When she applied for the inoculation, Mrs. Harrison filled out form CDC 7.31 which informed her that most people do not have any side affects from the vaccine but that tenderness at the site of the injection may occur. It informed her that some people may also experience fever, chills, headaches or muscular aches within the first forty-eight hours. There were also certain precautions pertaining to age, allergies to eggs, people with fever or anyone who had another type of vaccine within the past fourteen days; however, none of these applied to Mrs. Harrison.

Three days after receiving the injection, Mrs. Harrison began to feel numb in both

legs. This numbness spread to her hands and face. She was hospitalized and diagnosed as having Guillain-Barre Syndrome resulting from the swine flu inoculation.

Pursuant to the provisions of the Swine Flu Act and the Federal Tort Claims Act, Mrs. Harrison filed an administrative claim with the Public Health Service on May 1, 1978, for damages in the sum of $300,000.00 She stated the nature and extent of the injury forming the basis of her claim as being:

Paralysis (Guillain-Barre Syndrome) resulting from adverse effect of Swine Flu inoculation. Totally disabled at present time and disability will continue indefinitely.

Mrs. Harrison attached to her claim the following statement:

On October 13, 1976 at approximately 1:00 p.m. my employer, Mr. James E. Thompson, Attorney, and I went to "City Hall" of Memphis, Shelby County, Tennessee, 125 N. Main Street to receive swine flu inoculations being administered by Memphis and Shelby County Health Department, without charge. I signed the form CDC7.31 with the attached "Important Information About Swine Influenza (Flu) Vaccine (Monovalent)."

On October 16, 1976 approximately 6:00 or 7:00 p.m. I noticed a numbness in both legs; however, I did not become alarmed due to information on form CDC 7.31 that muscle aches within the first 48 hours could be expected. In the latter part of October, 1976 I began to experience numbness in my hands as well as in my legs. On November 1st, 1976, the condition began to affect my face, i.e., my face was drawn, I could not close my right eye. On this date, November 1, 1976 I was forced to leave work and I have not returned to work. By the latter part of November I had become completely paralyzed; this complete paralysis occurred while I was confined to St. Joseph Hospital East, Inc., 5959 Park Ave., Memphis, Tn. 38117.

I first went to see Drs. Collins & Collins, 5100 Poplar, Memphis, Tn. 38137 on about October 29, 1976. His impression was that I had a circulation problem. I was also seen by Dr. Helen Key Van Fossen, and I have been treated by Dr. Alan Nadel, Dr. Charles Cape, & Dr. Robert Kerlin.

I have taken extensive therapy and am presently able to get about without crutches. I am still totally disabled from work, presently drawing social security disability for myself and two children. I receive $335.00 per month and my children draw $152.00 per month each.

On November 11, 1976, I entered the St. Joseph East Hospital and my condition was diagnosed as Giullain-Barre Syndrome after a spinal tap and blood test was administered by Dr. Alan Nadel.

I am advised that my condition, Guillain Barre Syndrome and paralysis, is the adverse effect of the flu inoculation administered to me on October 13, 1976, and that my condition will continue indefinitely. Although I am able to walk I still have partial paralysis of my hands, legs & face.

The administrative claim contained the following certification:

"I certify that the amount of claim covers only damages and injuries caused by the accident above and agree to accept said amount in full satisfaction and final settlement of this claim."

The Public Health Service denied Mrs. Harrison's claim by certified mail dated March 9, 1981. That letter to Mrs. Harrison's lawyer stated:

CERTIFIED MAIL—
RETURN RECEIPT REQUESTED

Louis Eubanks, Esq.
147 Jefferson
Suite 1003
Memphis, Tennessee 38103

Re: Swine flu vaccine claim of Judy Harrison
Claim No. 78–V–1816

Dear Mr. Eubanks:

We are sorry to inform you that we cannot allow your client's claim for personal injury allegedly resulting from the administration of the swine flu vaccine under the National Swine Flu Immunization Program of 1976 (Public Law No. 94–380).

As the Department of Justice letter of December 29, 1980 advised you, your claim is hereby denied for the inability to arrive at a mutually acceptable settlement figure in this matter.

If your client is dissatisfied with this final denial, you may file a lawsuit against the United States in the appropriate United States District Court not later than six (6) months after the date of mailing of this notification of final denial.

> Sincerely yours,
> Sarah Hertz
> SARAH HERTZ
> Chief, Litigation
> and Claims Branch
> Business and Administrative
> Law Division

On July 2, 1981, Mrs. Harrison filed this lawsuit against the United States. She claimed the United States acted negligently by not conducting a more extensive program of research in the administration of the vaccine used in the program. She claimed the United States failed to advise and notify her that the condition of GBS, or other illness, could develop and be more severe than that which was set forth in the instructions given her. In addition to claiming that she had suffered physically and emotionally, she also claimed her condition was permanent in nature to the extent that her facial muscles, her leg, arm and hand muscles were weak. She claimed damages in the sum of $300,000.00 for medical expenses, lost wages, loss of future earnings, abridgment of earning capacity, pain, suffering and costs. She claimed her illness and disability were proximately caused by Guillain-Barre Syndrome which resulted from the swine flu immunization she received on October 13, 1976. Jurisdiction of the Court is based upon 28 U.S.C. § 1346(b) and 42 U.S.C. § 247b.

On August 5, 1981, this action was, by order of the Judicial Panel on Multidistrict Litigation, transferred to the United States District Court for the District of Columbia for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407.

The United States filed its answer to plaintiff's complaint on October 23, 1981.

The United States stated the following defenses: (1) failure to state a claim; (2) assumption of risk; (3) contributory negligence; (4) injuries not proximately caused by negligence/wrongful act of an employee, agent or agency of United States; (5) injuries caused by the intervening act of one other than the employee, agent or agency of the United States; (6) Court lacks subject matter jurisdiction because complaint based upon acts/omissions of employee of United States exercising due care in execution of a statute or regulation and not upon acts or omissions of a program participant, 28 U.S.C. § 2680(a); (7) Court lacks subject matter jurisdiction because complaint based upon exercise/performance or failure to exercise or perform a discretionary duty upon part of agency or employee of United States, 28 U.S.C. § 2680(a); (8) Court lacks subject matter jurisdiction because complaint is based upon misrepresentation, 28 U.S.C. § 2680(h); (9) Court lacks jurisdiction because complaint alleges strict liability against the United States, 28 U.S.C. § 1346(b); (10) Court lacks subject matter jurisdiction because complaint alleges breach of warranty against United States, 28 U.S.C. § 1346(b).

On July 1, 1982, this case was remanded to this Court for further proceedings in accordance with the final pretrial order filed in the United States District Court for the District of Columbia on November 14, 1979.

On August 31, 1982, Mrs. Harrison moved to amend her complaint by amending the ad damnum clause to request damages in excess of $1,000,000.00. In support of her motion to amend her complaint, Mrs. Harrison stated that at the time she filed her administrative claim, May 1, 1978, she had not been diagnosed as suffering from a permanent injury, and at that time, permanency could not be anticipated. In the proposed amendment, she claimed her condition had been determined to be permanent and this permanency constituted newly discovered evidence which was not reasonably discoverable at the time she presented her administrative claim. In the

proposed amendment, Mrs. Harrison claimed permanent facial problems, difficulty swallowing and chewing, drooping eyes, increased blinking, tingling and numbness of the extremities, weakness, fatigability, increased sensitivity of hands and feet, urinary difficulties, and lack of sensation and reduced strength for sexual intercourse. Mrs. Harrison claimed she could not have known at the time of filing her administrative claim that she would be faced with these permanent difficulties.

The United States, on September 23, 1982, filed a motion to strike the amended complaint. Counsel for the United States had not received notice before the amended complaint was filed. On this same date, the United States also filed a motion to reduce the ad damnum.

On October 1, 1982, Clifford Shoemaker, Esquire, counsel for Mrs. Harrison, sent a letter advising the Court that neither the Assistant United States Attorney nor the Department of Justice Attorney involved in this case were served with copies of Mrs. Harrison's motion to amend. Mr. Shoemaker suggested that the Court vacate its order of August 31, 1982. He also stated that he was sending the United States Attorney's Office and the Department of Justice copies of his motion to amend and requested the Court allow the United States a reasonable time to respond and for Mrs. Harrison to file a supplemental response.

The United States filed a response to the motion for leave to amend the complaint and a motion for the Court to vacate its order on October 15, 1982. Mrs. Harrison filed a reply to the response of the United States to her motion for leave to amend the complaint on November 3, 1982. The Court by order filed July 27, 1983, ruled:

The Federal Tort Claims Act provides that an action shall not be instituted for any sum in excess of the amount of the claim presented to the federal agency involved "except where the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegations and proof of interven-

ing facts, relating to the amount of the claim."

Plaintiff's original administrative claim was in the amount of $300,000, but she seeks to amend her complaint to seek $1,000,000. Although she contends that her claim falls within the statutory exception for newly discovered evidence, no evidence has been presented to support this contention. Plaintiff has the burden of establishing that an increase in the claim has resulted from newly discovered evidence and that such evidence was not reasonably discoverable at the time of filing the original claim. *See Kielwien v. United States,* 540 F.2d 676, 680 (4th Cir.1976), *cert. denied,* 429 U.S. 979, 97 S.Ct. 491, 50 L.Ed.2d 588 (1976). Plaintiff has failed to meet this burden; therefore, the Court denies leave to amend the complaint as to the increase in the ad damnum only.

The Court's action with regard to the ad damnum is without prejudice to the plaintiff. She is free to move the Court at a future date to increase the ad damnum with accompanying affidavits or other appropriate proof to demonstrate to the Court that the claim falls within the exception found in 28 U.S.C. § 2675(b).

*Testimony of Mrs. Harrison*

The testimony of Mrs. Harrison revealed that she was, at the time of trial, a thirty-seven (37) year old female, married, with two children, ages ten and twenty. When Mrs. Harrison contracted GBS, she was employed full-time as a legal secretary for Mr. James E. Thompson, an attorney practicing law in the city of Memphis, Tennessee.

On October 13, 1976, Mrs. Harrison and her employer, Mr. Thompson, received Swine Flu inoculations by the Memphis and Shelby County Health Department. The inoculations were administered at the Memphis City Hall, Memphis, Tennessee, pursuant to the National Swine Flu Immunization Program Act, 42 U.S.C. Section 247b. On the administrative claim form, filed May 1, 1978, Mrs. Harrison recalled signing Form CDC 7.31 with an attached pamphlet (Important Information About Swine Fluenza (Flu) Vaccine Monovalent).

The testimony of Mrs. Harrison shows that she began to experience the effects of GBS three to four days after immunization. She testified:

That weekend, after I had had it, we went to visit Robert's relatives. And I was talking to them about that my legs were feeling tingling and a funny sensation to them, and I said I really don't understand, but I really didn't think an awful lot about it at the time. And then just a few days later my hands started feeling numb. And I remember it was in my fingers first.

(Tr. 28–29).

Her administrative claim stated further: "I noticed a numbness in both legs. However, I did not become alarmed due to information on Form CDC 7.31 that muscle aches within the first 48 hours could be expected." Mrs. Harrison's symptoms became increasingly more severe until November 1, 1976, when Mrs. Harrison's facial muscles became drawn. She was discernibly weak. She had balance and equilibrium difficulties. She had difficulty using her arms and legs. Just prior to the November 1, 1976, state of condition, Mrs. Harrison visited her regular physician, a Dr. Collins, who prescribed vitamins. It was Dr. Collins' opinion Mrs. Harrison's occupation as a secretary was causing her circulation difficulties and thereby explained the "tingling" sensations. (Tr. pp. 29–30).

Mrs. Harrison was seen by Dr. Helen Van Fossen on November 11, 1976. (Tr. p 30). Dr. Van Fossen suspected that Mrs. Harrison was suffering from multiple sclerosis, and immediately admitted her into St. Francis Hospital in Memphis, Tennessee. Mrs. Harrison was under the care of Drs. Alan Nadel and Robert Kerlin. That same day a lumbar puncture procedure was performed and Mrs. Harrison was diagnosed as having Guillain-Barre Syndrome.

While at St. Francis Hospital, her primary care was provided by Dr. Alan Nadel, a Board Certified Neurologist. Further, while at St. Francis Hospital her condition worsened. She became paralyzed in all four extremities. Mrs. Harrison contends, and the United States agrees, that during this time Mrs. Harrison "had to be carried to the bathroom and could not bathe or clean herself." She remained in St. Francis for approximately one month. During her stay at St. Francis Hospital, she developed thrombophlebitis. To correct this condition, Heparin therapy was utilized. Mrs. Harrison described this therapy as being painful and extremely uncomfortable.

Mrs. Harrison was discharged from St. Francis Hospital on January 4, 1977. At the time of her discharge, she was able to walk with the support of a walker. She was quite weak, however, by the time of discharge.

After her discharge from St. Francis Hospital, Mrs. Harrison was admitted to Baptist Hospital, Lamar Unit, Memphis, Tennessee, ("Lamar" hereinafter). During her stay at Lamar, Mrs. Harrison was confined to a wheelchair. Mrs. Harrison described her stay at Lamar as often painful, and frequently very embarrassing. As an illustrative example of her feelings of embarrassment and humiliation, Mrs. Harrison testified:

And while I was there, also, I know this is all a part of it, but you didn't wear underclothes because they have to, they said it is just more things to have to get down. And they would take the back of your pants and to, yank you up, to get you up on, the therapist would because they are little girls. And when I was over there, to go to the bathroom I couldn't stand up for them to take down my clothes, so men had to hold me up while the ladies took my clothes, and it was just all these men and all of the shifts and everything was going on ... [t]hey would take you up and you had a little hospital type gown on, and then they would sit you off into a plastic type wheelchair that would actually go out into the shower. All of this is out in the hall where everybody is walking up and down and there is nothing in the back.

Mrs. Harrison was discharged from Lamar on March 21, 1977. At that time, she was again seen by Dr. Alan Nadel. Mrs. Harrison was using a walker to ambulate. She

had marked weakness in her legs and arms, with the greatest deficit in her legs. Dr. Nadel noted she had a positive mental attitude. She had facial weakness. Dr. Nadel continued to see Mrs. Harrison and noted her steady improvement. On her August 8, 1977, visit Dr. Nadel made this assessment of her condition:

"*Assessment:* [GBS] with gradual improvement."

(Patient Summary Notes of Dr. Alan Nadel, August 8, 1977).

On November 22, 1977, Dr. Nadel's notes described her:

"*Assessment:* [GBS] continuing to improve."

*Id.,* November 22, 1977.

Mrs. Harrison's next visit to Dr. Nadel on June 22, 1978, caused Dr. Nadel to note:

"*Assessment:* [GBS] almost entirely resolved, except for mild facial weakness."

Finally on Mrs. Harrison's final visit Dr. Nadel noted:

"*Assessment:* [GBS] almost totally resolved. No significant residual defect."

"*Plan:* I don't have any further plans at this time. She is doing well and is in full activity. She is working full time with her husband and has no restrictions in her activity. As far as I am concerned, she is discharged from my care and can return to see me only as needed. For all practical purposes, she has had a full recovery from her illness."

The Court finds that Dr. Nadel's observation, that she has had a full recovery from her illness, is just absolutely incorrect when viewed in conjunction with 1) the findings and testimony of other physicians testifying as expert medical witnesses, 2) actual demonstrations in Court by expert physician witnesses using Mrs. Harrison to show the Court permanent physical body limitations faced by Mrs. Harrison—which the Court finds to be severe, 3) the physical appearance of Mrs. Harrison—particularly her face, 4) her body movements, and 5) the Court's personal observation of Mrs. Harrison during the trial of this case which required four days. Mrs. Harrison appeared to the Court to be alert and a cooperative person, but who is obviously suffer-

ing from severe physical limitations and facial distortion. These severe physical conditions exist ten years after Mrs. Harrison was first diagnosed as having GBS.

*Psychological Impairments*

After the initial period of hospitalization and recuperation, Mrs. Harrison claims she suffered extreme mood depressions, irritability, numerous psychological fears, and sexual dysfunction. Accordingly, in September, 1982, she was referred to Dr. Bruce Lockwood, a clinical psychologist. Dr. Lockwood's evaluation of Mrs. Harrison showed she suffered chronic post traumatic stress syndrome, which was secondary to her contraction of GBS. Dr. Lockwood, an expert in the field of psychology testified:

A. I diagnosed Mrs. Harrison as experiencing a post traumatic stress syndrome, chronic in nature.

Q. Would describe in lay terms what that means?

A. Post traumatic syndrome is an emotional reaction that is usually pretty severe in intensity, and it is usually brought on by some traumatic event that is beyond that which is experienced by most people.

It's most frequently seen in veterans of wars or in people who have been in natural disasters, earthquakes, those sorts of things, but it also can be precipitated by a severe illness.

Dr. Lockwood testified to how he approached a treatment modality for Mrs. Harrison:

Q. Would you describe then to the court what you tried to do in your treatment sessions that you had with her as a result of that diagnosis?

A. One of the things that happens to people who have gone through any kind of severe traumatic stress is that they feel very much out of control, things have happened to them that they have no control over.

One of the things that I tried to do with Mrs. Harrison was to help her identify those areas of her life that she could control. She had no control over the

neurological problems that developed from her illness, but there were some things that she could do in changing her own behavior that might help her to cope better with the problems that had occurred.

Q. Would you describe in detail what you went about doing?

A. There were several areas where Mrs. Harrison was having some problems. One of them was that her sleep pattern had been disrupted considerably and she was not sleeping well. Part of that was due to severe nightmares that she was having two or three times a week.

He also testified:

Q. You saw her illness and subsequent physical limitations as having become a central focus in her life, did you not?

A. That's right, when someone—I think one of the things that happens is when someone is experiencing a severe physical illness and they begin to recover, they see very rapid recovery for a while, and at that point in time they may not be very seriously depressed because they may see themselves as getting better. And they may say, gee, I am going to pull through this okay, and the time comes, and it came for Mrs. Harrison, when she was released from the hospital and the message was given to her from here on out the recovery will be slower, there will still be recovery, but there are going to be some residuals.

I think what really kind of clinched it was, when she tried to go back to work, which I think for her was the sign that, okay, I've recovered, if I can go back to work part-time, and she went back to work and found out that she had to make a decision at that point because she could work, she didn't feel good when she got home, she was extremely irritable, she didn't have enough energy left to do any of the things she felt like she needed to do to be a good mother and a good wife, and at that point I think that was a big time for her when the realization that, you know, that I am not going to come through this unscathed.

Q. That is according to what she was telling you and your perception?

A. Yes, and also from what I know about how people recover from physical illnesses.

Addressing Mrs. Harrison's future, Dr. Lockwood said:

THE WITNESSES: I think whenever Mrs. Harrison looks at herself, she sees a lot of areas that she has experienced some real loss in, and there is not a thing that I can do that is going to take away that loss, it is always going to be there. She is always going to be faced with it from time to time and there are likely to be periods when her feelings about herself, her feelings of self-esteem are likely to be lower than others.

The point that I was trying to make is that during those times she may go through fairly brief periods where some supportive therapy could be helpful to her.

The—a lot of what psychotherapy can do for Mrs. Harrison is in terms of helping her deal with what she has got to deal with, because, you know, I don't know of anything that I can do that is going to drastically change her situation. What I can help her change is her ability to cope with it.

From the testimony at the trial, the Court finds almost all of the witnesses testified Mrs. Harrison had a positive, success oriented attitude throughout her illness. However, notwithstanding her positive outlook, she suffered a traumatic GBS illness which included, but was not limited to: complete paralyzation, facial disfigurement, and numerous other physical and nerve maladies which will continue in the foreseeable future to cause an onset of post traumatic stress syndrome in Mrs. Harrison.

The Court finds, by a preponderance of the evidence in the record, this diagnosis that Mrs. Harrison will continue to suffer post traumatic stress syndrome in the foreseeable future constitutes newly discovered evidence not reasonably discoverable at the time she presented her claim to the Public Health Service on May 1, 1978. Therefore,

it is proper for the Court to allow the amendment to her complaint for this reason. *See, Bonner v. United States,* 339 F.Supp. 640 (E.D.La.1972); *Southwick v. United States,* No. 80–3011 (S.D.Ill., June 24, 1981); *Joyce v. United States,* 329 F.Supp. 1242 (W.D.Pa., 1971).

*Neurological Testimony*

*Dr. Peter Lichtenfeld,* a Neurologist, practicing medicine on Long Island in New York, testified he earned the Doctor of Medicine degree from Pennsylvania School of Medicine in 1965. He performed a rotating internship with sub-specialties in internal medicine, general surgery, pediatrics, obstetrics, gynecology and emergency room care at Long Island Jewish Medical Center from 1965 to 1966. He did a residency in internal medicine for two years followed by a fellowship in neurology for one year. This was followed by a two year residency in neurology at Mt. Sinai Hospital in New York City. He also served as a teacher at Brown University, Providence, Rhode Island, and head of the Division of Neurology at Roger Williams General Hospital.

As a result of having *personally* suffered Guillain-Barre Syndrome, Dr. Lichtenfeld testified he began to study other patients with the Guillain-Barre Syndrome. He said he was looking for the same type of phenomenon that had occurred to him when he was ill. He described that phenomenon:

Q. What type of phenomenon?

A. Well, I had marked abnormalities of my heart rate and my heart rhythm as well as other manifestations of difficulties with the autonomic nerves. These are the nerves that control the involuntary functions in the body, such as your blood pressure, your heart, your breathing, the things that you have no direct voluntary control over.

Up until that time Guillain-Barre Syndrome was understood as an illness that mainly affected the motor or the sensory nerves. But after my experiences it became apparent that the autonomic areas were equally as vulnerable and were the source of a great deal of the morbidity and mortality of the illness.

When he had collected data on twenty-eight patients, he reported his findings in an article published in the *American Journal of Medicine* in 1971. Dr. Lichtenfeld said he has seen well over two hundred patients with the Guillain-Barre Syndrome. He said he has been the primary care physician for over two hundred patients. He has seen approximately one hundred other patients in a consultant/adviser capacity.

On direct examination, he described the Guillain-Barre Syndrome:

Q. Can you very briefly describe to the Court what Guillain-Barre Syndrome is?

A. Well, it's an immune mediated affliction of the peripheral nervous system mostly, which evolves over a period of days or weeks or sometimes longer and produces a lack of function in those nerve fibers. On rare occasions it can also affect the central nervous system, but it was primarily a disease of the peripheral nervous system.

As motor fibers are affected, there is a paralysis of the muscles that those fibers serve. As the sensory fibers are affected, there is a loss of sensation or an abnormality of sensation. And as autonomic fibers are affected, there is a disruption of function of those organs under the control of those fibers, such as the bladder, or the heart, or the blood vessels, the involuntary muscles that you have no volition or control over.

Q. What is the typical course of the Guillain-Barre Syndrome?

A. Well, a typical course is to come on somewhat insidiously, to progress steadily over a period of weeks, reach a maximum deficit, and then to hold in a plateau for a variable period of time and then begin to improve. And it is extremely variable, some people will reach their maximum deficit in a matter of hours, and some will not reach that maximum deficit for several months. Some people will plateau and stay plateaued for months, some will never make any recovery. Some people recover rapidly, others recover slowly, some recover com-

pletely, and others incompletely, and some manifest a rocky course where they make some recovery and then they get a little worse and then make some more recovery and then get a lot worse, so you can never predict exactly in the beginning what course will be followed. But the typical case is the one that I described for you.

Q. And the typical case, maybe if you could just describe that again, the most typical case?

A. Begins insidiously, it usually takes a few days for the patients to seek help, very commonly it is not diagnosed properly by the first physician to see the patient, some other label is put on those symptoms. But as it gets worse it becomes more obvious what is happening and eventually, when a patient is significantly disabled, the diagnosis can be established.

The patient will continue to get worse for a period of time after that unless the making of the diagnosis was delayed to the point where they were already at their worst, and then at some point thereafter they will start to improve.

Q. What is the typical level of recovery of the Guillain-Barre patient?

A. Well, that is also very variable. I have seen patients who made no recovery at all, and then I've seen many patients who made a complete recovery as far as you could tell when you examine them. And then there are a large number of patients that fall in between those two categories.

Q. Do certain numbers of, of patients have relapses or recurrence of Guillain-Barre Syndrome?

A. Approximately five to ten percent will run a course that is not the typical one that I outlined, in that they may relapse while they are getting better or they may recover completely, and then at a future date have something similar again or have an up and down course, but you combine all of those atypical courses, and it amounts to about five and ten, between five and ten percent.

Dr. Lichtenfeld said he reviewed the medical records, took a medical history and examined Judy Harrison twice. The first examination was on August 19, 1983, and the second examination was on November 18, 1985.

Dr. Lichtenfeld described his August 19, 1983, examination as follows:

BY MR. SHOEMAKER:

Q. Doctor, go ahead and describe, if you would, please, in detail of your examination of Judy Harrison on August 19th, 1983?

A. Do you want me to describe what I can remember, or what I have written down, or both?

Q. Well, both if you can, whatever you can recall is fine, but if you need to refresh your recollection by referring to your office records, that is fine.

A. Well, I recall that she has had some very obvious deficits, neurologic deficits from her illness when I first saw her in 1983. Her facial weakness was very apparent when she walked in to the office. Her gait was not normal either. She had residual weakness in all four extremities and in her trunk, and she had sensory deficits in her hands and her feet and around the vagina and anus.

I recall her crying when she was describing to me what arrangements had to be made for her children when she was hospitalized. She had to stop for a while, she had to compose herself and before we could go on discussing whatever we were talking about.

Now, I have to refer to my notes for the specific details.

THE COURT: Before you do that, would you define deficit as you use the term.

A. Deficit—the lack of function of a structure. If it is a motor deficit, it is comparable to saying it is weakness. A sensory deficit means there is a lack of normal feeling.

Q. Now, if you would refer to your notes for me to give the more detailed description of what you did, and the results of your interview and the examination?

A.  She demonstrated weakness in almost all of the muscles of both legs, the right was weaker than the left.  This included functions of plantar flexes, which is the downward movement at your ankle as if you were stepping on a peddle, as well as the dorsiflection, which is the upward movement of the ankle, also of the toes in both directions.  There was weakness of the thigh muscles, and the hip muscles, and the buttocks.

The reflexes were abnormal at the ankles.  They were unobtainable.

She was unable to lift her legs up in the air when she was lying on her back on the examining table.  When trying to lift both legs up at the same time by placing her feet together and lifting, she could not do that.

She also had weakness in her arms around the shoulder area, and in the hands, the fingers, both hands.

She had a little atrophy, that is shrinkage of the muscles, the small muscles of her hand.

She had impaired sensation in her hands from the tips of the fingers to the base of the fingers on the right hand and from the tips of the toes to the ankles on both feet.

She made errors when being tested with a vibrating tuning fork to see if she could detect the vibration when it was placed over her toes.

Q.  What is the significance of that?

A.  That's another assessment of sensation.  It is a different assessment of sensation.  Her face was weak, very weak, and it was much weaker on the right side than on the left.

The palpebra fissure, which is the opening of the eye, the size of the opening of the eye was smaller on the right than on the left.

She was barely able to show me her teeth by contracting her facial muscles.  When she tried to whistle, only one side of her mouth actually moved.  When she smiled, only one side of her face moved.  The left side in both of those cases.

When she was just sitting at rest it was obvious that the right side of her face was considerably weaker than the left side of her face.

She had impaired sensation around the vagina and around the anus on both sides.

Q.  Now, Doctor, did you have her try to stand on her toes or heels or anything like that, was she able to do that?

A.  She was barely able to do it.  It was obvious that it was difficult for her to do it.  The right side was having more difficulty than the left in both standing on the toes and walking on the heels, although she was able to do it, it was obvious that she was barely able to do it.

He described, by way of history, problems Mrs. Harrison was having in August, 1983:

Q.  Would you describe to the Court what you obtained by way of history in terms of the problems that she was having at that point in time, and this was in August of 1983?

A.  Well, she described a number of everyday activities that she was unable to do in a normal fashion.  For instance, in order to get out of a chair or to stand up after sitting on a toilet seat, she had to use her arms to push herself up, and that was easily demonstrable in the office, too.  I had her squat, and she could not get back up on her feet without pulling on the furniture or, if there was no furniture to touch, by putting her hands on the ground and pushing herself up on her hands until her legs were as straight as they could be.

She described that she had difficulty going up and downstairs.  If there was no handrail to hold on to, she couldn't do it unless there was a wall to touch that gave her some steadying influence, but if there was nothing to hold on to and nothing to touch, she felt that she could not do it, would probably have to crawl up or come down sitting on the steps.

If she was on the floor for any reason, she could not get back up on her feet without crawling for a piece of furniture or pushing herself up on her hands.  If she was in the bathtub, the only way that she could get out was to turn over on her

stomach and push up on all four extremities until she was upright. She couldn't carry things, like her vacuum cleaner, up the stairs because she couldn't handle the stairs and the carrying simultaneously, she had to go up empty-handed.

She stated that she fatigued very easily, that just a nominal amount of activity made her have to stop and rest. She couldn't get through just the routine cleaning of her house without stopping. She fatigued very easily. It was an effort for her to do things physically, including just walking, standing, moving about.

Q. Is fatigability a common sequela of Guillain-Barre Syndrome?

A. It is, it is a sequela of anything that makes for muscle weakness. When you are using muscles that are weak, they will fatigue and feel weaker in a much shorter time than a normal muscle will. And she was obviously trying to go about her business with a lot of weak muscles.

Q. Is there anything else about your history or examination that is significant that you haven't already conveyed to us?

A. Well, she told me that she was aware of the numbness in her vagina and in that area, that it made sex feel very strange, practically no normal feeling associated with sex at all, an awareness that something was happening, maybe a pressure feeling, but not a normal sensation, that this had been the case ever since she got sick and was still the case.

That she was aware of her facial appearance and it was a source of embarrassment. That she was depressed over her circumstance and that she was angry but she didn't know at whom she was angry. That she was more irritable at home with her family, and that she didn't really expect, in 1983, to be left with this many problems when she had thought early on that she was going to make a complete recovery.

Dr. Lichtenfeld described the November 18, 1985, examination and his findings:

Q. Now, Doctor, would you describe then, I guess you had occasion to examine her yesterday or last evening at the Peabody Hotel, would you describe the results of that examination?

A. Well, it's hard for me to label whether she is better or worse because in some respects it's both. She has regained some motor function so that some of the muscle testing is slightly improved as compared to two years ago, particularly in her extremities. It's not normal but it is not as abnormal as it was. But in her face the improvement has resulted in a vastly worse cosmetic appearance so that now her face suffers with an unfortunate consequence of damage to the facial nerves and that she no longer has complete control over the muscles on her face. When she wants to contract one set of muscles in her face, she involuntarily and totally beyond her control contracts an additional set of muscles on her face so that any movement of her mouth results in a movement of around her eye, of the muscles, and she cannot separate those functions out, and this has developed as the movement has come back.

Now, that has changed noticeably from 1983. In 1983 the outstanding finding in her face was that the muscles were very weak, they were still paralyzed.

Now, some of those muscles, while they are still weak, are contracting, but they are contracting in an aberrant way, we call this a synkinesia, s-y-n-k-i-n-e-s-i-a. The brain sends a message to contract the muscle of the cheek or the corner of the mouth, and the muscle around the eye contracts at the same time resulting in her closing the eye involuntarily.

Q. Doctor, you have drawn something on the board. If you could describe to the Court what it is that you are talking about with respect to her facial muscles?

A. This is a very rough schematic.

THE COURT: How about orienting us to your drawing. Obviously I see what it is, I think that I see two eyes, a nose, a mouth.

A. That's right. What I have drawn here is a bundle of nerve fibers in the facial nerves, that is the nerve supplies the innervation to all of the muscles on

one side of the face, and I have drawn just four fibers, although there are many hundreds of fibers in the nerve, I have picked out four.

Now, before anything happened, before there was any illness, fibers one and two originated in that part of the brain that controlled movement of the muscles on the side of the mouth so that, if those fibers fired, the brain wants the mouth to move, the message goes down these nerve fibers one and two and the side of the mouth pulls over or goes up in a smile or opens up to show the teeth or puffs out the cheek. While fibers three and four in the same nerve are coming from that part of the brain which controls the muscle around the eye which enables you to close your eye, so if fibers three and four fire, the eye would close.

Then the illness comes along and it knocks out these fibers, it just destroys the lining around the fiber so that none of these fibers work. At that point the entire side of the face is paralyzed. You can't close your eye. You can't move the side of your mouth. All of the muscles are paralyzed at the same time.

Unfortunately, what happens in some people as they recover, as the nerve fibers start to regrow, some of them grow down the wrong track.

And what I have drawn here is fiber number two regrowing where fiber number three used to go, and fiber number three regrowing where fiber number two used to go.

Now nothing has changed up in the brain, the brain says move the corner of the mouth, that sends a volley of impulse down fibers one and two, but now the impulse coming down fiber number two makes the eye close. And when the brain says close the eye, the impulse comes down fibers three and four, but now fiber three is serving the muscles around here, so there is a contraction down there. You can't retrain the brain, to redirect it, it becomes an involuntary concomitant contraction of a muscle that you didn't want contracted at that time. And we call that synkinesia.

Summarizing his findings pertaining to Mrs. Harrison's face, Dr. Lichtenfeld said:

Two years ago when you looked at her face, the first thing that you noticed was that it was obviously weak. Today when you look at her, the first thing that you notice is that it is obviously contorted with these contractions that she has no voluntary control over. I think that demonstrates it.

Dr. Lichtenfeld put Mrs. Harrison through a number of demonstrations for the Court. It was obvious Mrs. Harrison suffers major motor deficits which, the physician says are permanent.

Q. Doctor, would, based upon the testing that you performed on Mrs. Harrison, would she be able to play tennis?

A. Oh, no.

Q. Would she be able to run?

A. I tried to have her run last night in the corridor of the hotel where it was a smooth carpet, and she didn't fall down but she didn't get anywhere too fast. She cannot, she is not safe when she is doing things like that on her feet.

Q. In your opinion is her condition, as you have described to the Court today, a permanent condition?

A. Yes, it's permanent. Obviously there has been some changes in the past two years, but the overall patterns, functional patterns are the same except that the face looks worse.

Cross examined by Mr. Dycus, Dr. Lichtenfeld testified about five to ten percent of Guillain-Barre Syndrome patients suffer relapses:

Q. Where is the data collected or, well, where is the data reported? And by that, I mean in what, in what journal is it reported that there are relapses in about five to ten percent of Guillain-Barre patients?

A. I think every comprehensive text that discusses the question will have that information if they address the question at all.

Q. Okay. Under what circumstances does the relapse occur?

A. Well, in my experience most of the times it is spontaneous and you can't

identify why it happened at the particular time that it did. I have seen some patients relapse where I an convinced that I know exactly what made them relapse.

I have seen patients relapse after a vaccination, relapse overnight after being vaccinated. These are patients that recover from GBS, have made a substantial amount of recovery were vaccinated with a flu vaccine and then overnight paralyzed back to ground zero.

Q. How long after their original illness?

A. Well, the one that stands out was a young girl that had, we made a study, continuous recovery for about three months and then was transferred to a children's rehabilitation facility for therapy, and it was the policy of that institution to give every new patient a flu shot, and she was back to completely totally paralyzed the morning after the flu shot.

Q. Did you discuss with Mrs. Harrison the chance that she might relapse, did she bring that up with you?

A. I remember her mentioning that as a concern because she said something to the effect she was afraid to congregate in large crowds because she might catch something and whatever she might catch might make her relapse, I remember her saying something along those lines.

Q. That is not in the report you wrote, is it?

A. Well, I don't know. If it is not in there, then it is not in there. I don't know if I put that in the report or not.

Q. Would you look at your report and tell us?

A. No, it's not in my report.

Q. So, if she said something to you about that that certainly wasn't a major concern or at least you didn't see it as a major concern?

A. Oh, it stood out in my mind because I've seen many people who carry emotional consequences after going through GBS, and I think she is the only one whoever told me that she was afraid to mingle with other people because of the fear of getting it again, so that stood out.

Referring to Mrs. Harrison's claim of loss vaginal sensation, Dr. Lichtenfeld testified:

Q. Okay. Do you know any medical journals where it is reported that loss of sensation around the, in the vagina might result from Guillain-Barre Syndrome?

A. Well, I know there have been a number of cases where that symptom is included in the case description of the patient, and I don't remember how many of them were men and how many of them were women, but it is the same phenomenon. One of Guillain's original cases had that problem, one of the original ones that he reported in 1936.

The Court finds a preponderance of the medical evidence in the record supports Mrs. Harrison's claim of newly discovered evidence pertaining to the severe extent of her neurological deficit. This evidence, among others, of synkinesia permanent facial distortion and loss of vaginal sensation was not reasonably discoverable by Mrs. Harrison when she presented her administrative claim to the Public Health Service on May 1, 1978.

*Urogenitary Dysfunction*

Plaintiff further alleges significant urological damage caused by her GBS which is newly discovered evidence and was not reasonably discoverable at the time she presented her administrative claim to the Public Health Service. Mrs. Harrison was examined by two physicians, *Dr. Robert Rhamy* and *Dr. Bradford Kinchloe*, on this aspect of her claims. Dr. Rhamy's testimony was offered by Mrs. Harrison and Dr. Kinchloe testified for the United States. As might be expected, their evaluations of Mrs. Harrison's urological condition contained marked differences.

Dr. Rhamy was presented to the Court with a most impressive *curriculum vitae*, which included membership in the Clinical Society of Genito-Urinary Surgeons (the twenty-five most prominent urologists in the world), and over one hundred publications in the field of genito-urinary disorders. Dr. Rhamy testified that in his opinion Mrs. Harrison suffered from a neurogenic bladder condition. Dr. Rhamy ex-

plained the phenomenon of a neurogenic bladder as being a disorder involving the nerves controlling bladder function, as opposed to a myogenic bladder which involves the muscles of the bladder. Both Dr. Rhamy and Dr. Kinchloe agreed that Mrs. Harrison suffered from external sphincter dyssynergia, or an inability to relax the external sphincter muscles, thereby resulting in a restricted urine flow and high volumes of residual urine retention.

These two medical witnesses did, however, disagree as to the extent of Mrs. Harrison's innervation to her bladder. On this point the Court notes that while Dr. Rhamy's credentials in urology are most impressive, Dr. Kinchloe testified that he is not a urologist. The Court finds Dr. Rhamy's expert medical opinion on Mrs. Harrison's urological condition to be entitled to greater weight and credibility inasmuch as his examination (including an extensive urodynamic study) and obvious expertise reasonably establish with medical certainty Mrs. Harrison's urological damage. It is Dr. Rhamy's opinion that Mrs. Harrison remains at a greatly increased risk of bladder infection throughout her lifetime due to her poor urological functions and weak muscle tone.

*Dr. E. Dewey Thomas,* an orthopedic surgeon, first testified to Mrs. Harrison complaints about loss of muscle strength:

Q. Doctor, what were the complaints at the time that you examined Judy Harrison?

A. Mainly her complaints involved balance, particularly with steps and uneven surfaces. She complained of cramping in both hands, extreme difficulty from, arising from a sitting or squatting position. Particularly if she was in a bathtub.

Difficulty opening jars or to carry out any dexterous movements with either hand, particularly her right hand. Extreme difficulty carrying out routine household duties such as sweeping and mopping. She complained also of inability to carry out leisure activities, which she apparently had enjoyed previously, such as playing tennis and swimming.

Q. Should that have been swimming and diving as opposed to swimming and driving?

A. Swimming and diving, yes, sir. She stated that the only work that she had carried out subsequent to her Guillain-Barre Syndrome was as a part-time bookkeeper for her husband for approximately one year. She related to me that she had previously worked as a legal secretary for some ten years in Memphis, but that she had been unable to continue this duty as it required frequent trips to the courthouse which involved stair climbing and things of this nature.

She further related that at the time of considerable distress to her, as well as her husband, was her lack of feeling during love-making and her inability to achieve orgasm. She stated that this has affected her marriage to a rather marked degree.

She complained of muscle tone loss in the vaginal area and went so far to state that her husband felt that it wasn't there.

On physical examination Mrs. Harrison was a very pleasant female in no acute distress. Her facial features revealed some slight tendency to drooping of the right eyelid as to facial asymmetry on the right as compared to the left. There was particular, this was particularly noticed on wrinkling the forehead or smiling. She had considerable loss of strength in both arms against gravity. She was able to hold against gravity but not against resistance, particularly on the right as compared to the left. Her upper extremity reflexes, both the biceps and triceps, were diminished bilaterally. She had considerable difficulty walking on heels and toes. She could make effort and get to a heel and toe stance but with extreme difficulty, and could not walk on heel and toe gait. Her deep tendon reflexes in her lower extremities were also slightly diminished. She had what appeared to be intact sensation in her upper extremity and just grossly in her lower extremity, also.

He then testified to her employability:

Q. Doctor, could you discuss for the court your opinion concerning Mrs. Harrison's employability?

A. Mrs. Harrison's employability certainly places her at a great risk, not only to herself, but to her employers as far as injuries that might occur in any job performance which would require stair climbing, long periods of standing, walking on rough or uneven surfaces. I do not feel that Mrs. Harrison, either on her initial examination on August the 18th, 1982, or on her more recent examination of November the 12th, 1985, could carry out any type of full-time gainful employment, only in the most sedentary type of employment do I feel that Mrs. Harrison would be qualified to carry out due to, primarily, her fatigability aspect, and only then probably with only giving up a lot of other aspects of her life, such as the household duties, which she is able to do only with some effort even at this time.

Q. Now, Doctor, you mentioned, and I had forgotten to inquire, concerning your more recent evaluation of Mrs. Harrison. Could you describe your recent evaluation of her and what changes you noted between the time that you originally evaluated her and the recent evaluation?

A. The most noticeable changes that I saw with regard to Mrs. Harrison with aspect to her facial asymmetry and the right-sided droop as far as her upper right eyelid from an orthopedic standpoint as far as muscle strength on a gross testing grip, ability to stand, ability to be on her toes or heels, and to hold her arms and hands against gravity were essentially unchanged, there was some variability, but essentially unchanged I felt from her previous examination of August the 18th, 1982.

Q. All right. Now, had you completed your answer concerning employability, I didn't mean to jump back and forth?

A. Again, I feel that Mrs. Harrison has a situation in which she would require periods of rest to carry out any activities that would be taxing at all from a physical standpoint. I do not feel that she can carry out any activities requiring dexterity of her arms or hands, such as typing, at least not over a prolonged period of time. So, that would eliminate, for example, a secretary, things of this nature.

Any activity which required walking for any extended period of time again or stair climbing or walking on uneven surfaces, even having to park a block away from her place of employment, would be very taxing and tiring to her, would subject her to the possibility of falls and things of this nature.

As to Mrs. Harrison's disability, Dr. Thomas said:

Q. And did you form any conclusions on the basis of your exam, history, and the Cybex evaluation concerning Mrs. Harrison's disability?

A. Certainly. The Cybex testing as carried out by Mr. Redgren did indicate that there was muscle weakness, more pronounced on the right than on the left, which in Mrs. Harrison's case was of significance in that she was a right-sided individual, in that she was right handed and should have normally been stronger on the right side than the left.

It also indicated that there was fatigability as a part of the testing, which she could not carry out the maneuvers requested through the testing on an extended period of time.

Q. Did you assign a disability rating to her at that point in time?

A. Yes, sir, I did.

Q. And would you describe that rating and how you arrived at that rating?

A. I felt that Mrs. Harrison, from an anatomical impairment to the body as a whole, retained approximately 35 to 40 percent impairment of the body, which, from a functional disability or ability to carry out work, would be somewhat greater than this, probably in excess of 60 percent of the body as a whole.

Q. Now, in assigning the 35 to 40 percent impairment to the body as a whole, did you take into consideration other aspects of her situation, such as her face, sexual dysfunction, and that sort of thing?

A. No, sir, I did not. This was strictly on an orthopedic evaluation.

*John Allyn Redgren,* a physical therapist testified to the results of two examinations of Mrs. Harrison. The first evaluation was performed in August of 1982. He testified:

A. The initial evaluation performed in August of '82, I selected four major muscles, the extensors and the flexors at the knee joint, the plantar and dorsi-flexsors at the ankle joints, the abductors, a-b -ductors and ad-, a-d, -ductors of the shoulder joint, and flexors and extensors at the elbow, those are muscle groups as opposed to specific muscles.

Q. Okay.

A. Okay.

Q. What were the results of your evaluation in Mrs. Harrison's case?

A. Okay. Talking first about the knee extensor/flexors. There were two different speeds used to test, 60 degrees per second and 180 degrees per second.

The reason for those two speeds are, number one, these are standard protocol speeds for the particular joint involved. The slower speed represents the assessment or the ability of one to give a single maximum effort strength. The fast speed is on the low end of the functional spectrum, functional activity sufficient as far as the daily activity, walking on the level surface or stair climbing, something of that nature at 180 degrees and the number of repetitions to measure fatigue and the ability to perform numerous contractions.

Mr. Redgren retested Mrs. Harrison in November of 1985. He described the results of those tests:

Q. Would you describe the results of your re-testing?

A. Okay. As indicated on the cover-sheet, the significant results of the retest in November of '85 was as noted: The right quadricep was much weaker in November of '85. The right elbow extension and the right elbow flexion significantly weaker. And I am comparing to her left side in all cases when I say right

quadriceps, it is weaker in the '85 test and weaker than the left side.

Again the elbow extension was weaker than in '82 and weaker in the right side.

And the right elbow flexion significantly weaker in the right shoulder some weaker with the exception of the adduction which was greater in November of '85, and '82 there was some weakness noted.

Q. Now, when you say weaker are you talking about in comparison to the other side?

A. In comparison to the other side and in comparison to the previous test.

Q. So, it is comparing also to her previous, the norms of her previous test, is that correct?

A. That's correct.

Q. So, even though we are not dealing with norms, we are dealing with a previous test on this same individual?

A. That's correct, a test administered in essentially the same manner.

Q. Other than a change in the weakness of those muscle groups, are there any other possibile explanations for that disparity?

A. Yes, there are possible explanations, anyone of which could be true. It could be the state of fatigue or the lack of fatigue of the patients at the time that the test is administered. It could be as a result of the overlying conditions of the disease process itself. It could be of anticipation of pain that the patient experienced on the initial test that they don't want to experience again subconsciously.

■ The Court finds, from a preponderance of the medical evidence in the record, that Mrs. Harrison has presented newly discovered evidence showing that she suffers the disabling effects of 1) post traumatic stress syndrome, 2) Synkinesia, 3) external sphincter dyssynergia/neurogenic bladder, and 4) permanent facial distortion and 5) loss of vaginal sensation. This evidence is shown by expert medical testimony to have been not reasonably discoverable by Mrs. Harrison at the time she presented her administrative claim to the Public Health Service on May 1, 1978. In

addition, she has supported her allegations by proof of intervening facts relating to the amount of her claim. In this case an increased *ad damnum* is entirely appropriate. Citing, *Nichols v. United States*, 147 F.Supp. 6, 9, (E.D.Va.1957), Mrs. Harrison correctly asserts:

Considerable discretion is vested in the district Court to determine what constitutes newly-discovered evidence not reasonably discoverable at the time the claim was presented, or what is tantamount to intervening facts, relating to the amount of the claim.

*Id*, at 9. As stated in *Kielwien v. United States*, 540 F.2d 676, 679 (4th Cir.1976), citations omitted:

The right to sue the Government exists wholly by consent as expressed in § 2675, 28 U.S.C., which fixes the terms and conditions on which suit may be instituted. The first requirement is the filing of a claim. That requirement is jurisdictional and is not waivable. The statute further provides that no action shall be instituted "for any sum in excess of the amount of the claim presented to the federal agency." The statute, however, includes an escape clause with reference to this ad damnum limitation. It adds that a plaintiff may sue for a sum greater than that stated in his or her claim if "the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts, relating to the amount of the claim." The burden of establishing such "newly discoverable evidence" or "intervening fact," it has been held rests on the claimant-plaintiff.

The Court, for the reasons stated, concludes the newly discovered evidence presented by Mrs. Harrison was not reasonably discoverable by her when she presented her claim to the Public Health Service, and this newly discovered evidence entitles her to invoke the exception contained in 28 U.S.C. § 2675(b). Mrs. Harrison is therefore entitled to and the Court grants her motion to amend the ad damnum claim of her complaint to increase her claim for money damages from $300,000.00 to an amount in excess of $1,000,000.00.

## ITEMIZATION OF DAMAGES

From the record, exhibits and testimony, the Court finds Mrs. Harrison incurred the following medical expenses proximately caused disabling by her GBS illness.

### I. *Medical Expenses*

Hospital Expenses:
St. Francis Hospital . . . . . . . . . . . . . . $7,049.50

Baptist Hospital
In-Patient . . . . . . . . . . . . . . $3,924.25
Out-Patient . . . . . . . . . . . . . . 1,694.90
Total Baptist Hospital Expenses . . 5,619.15

Total Hospital Expenses . . . . . . . . . . $12,668.65

Physicians Expenses:
Dr. Avgenis . . . . . . . . . . . . . . . . . . . . . . $ 53.00
Dr. Collins . . . . . . . . . . . . . . . . . . . . . . 11.00
Dr. Kerlan . . . . . . . . . . . . . . . . . . . . . 1,142.00
Dr. Lockwood . . . . . . . . . . . . . . . . . . . 915.00
Dr. Van Fossen . . . . . . . . . . . . . . . . . 10.00
Dr. Cape
Hospital Visits . . . . . . . . $200.00
Re-evaluation Visit . . . . 35.00
Test . . . . . . . . . . . . . . . . . . 45.00
Test . . . . . . . . . . . . . . . . . 66.00
Test . . . . . . . . . . . . . . . . . 35.00
Total Dr. Cape Expenses . . . . . . . 381.00
Dr. Nadel
Examination . . . . . . . . . . . $ 20.00
Hospital Visits . . . . . . . . 940.00
Office Visits . . . . . . . . . 45.00
Total Dr. Nadel Expenses . . . . . . 1,005.00
Memphis Physicians Radiological
Group Expenses . . . . . . . . . . . . . . . . . 52.50

Total Physicians Expenses . . . . . . . . . $3,569.50

Medical Equipment:
Wheelchair Rental . . . . . . . . . . . . . . . . $ 26.50
Braces . . . . . . . . . . . . . . . . . . . . . . . . . . 250.00
Toilet Rail . . . . . . . . . . . . . . . . . . . . . . 18.48
Toilet Seat . . . . . . . . . . . . . . . . . . . . . . 15.81
Total Medical Equipment Exp. . . . . . . . . . . $ 310.79

Travel Expense (mileage while being treated: 20.5 cents per mile):

Bolivar, Tenn. (Dr. Jennings)
(1 trip: 40 mi. × 20.5 cents) . . . . $ 8.20

Bolivar, Tenn. (Dr. Lockwood)
(12 trips: 480 mi. × 20.5 cents) . . . 98.40

Memphis, Tenn. (Baptist Hospital)
(1 trip: 160 mi. × 20.5 cents) . . . 32.80

Memphis, Tenn. (Mr. Harrison to Hospital)
(65 trips: 3,600 mi. × 20.5 cents) 738.00

Therapy
(65 trips: 3,900 mi. × 20.5 cents) 799.50
Total Travel Expenses . . . . . . . . . . . . . $1,676.90

Miscellaneous Expenses:
    Baby-sitting (Incurred while being treated) .......................... $1,260.00
        Total Miscellaneous Expenses ....... $1,260.00

**TOTAL MEDICAL EXPENSES ...** *$19,485.84*

## II. *Economic Losses*

Widely diverse views have been expressed by two expert witnesses testifying about the economic losses suffered by Mrs. Harrison. These two witnesses are 1) Dr. Kurt F. Flexner, Chairman of the Department of Economics and Professor of Economics at Memphis State University, Memphis, Tennessee; and 2) Dr. Douglas K. Southard, Professor of Finance at Rhodes College, Memphis, Tennessee, and partner in the firm of Mercer Capital Management, Inc., Memphis, Tennessee. Dr. Flexner is an economist. Dr. Southard stated he is a financial economist, which he defined as the study of evaluations, evaluations of assets and earnings streams. After careful review and study of the entire testimony of each expert witness, the Court concludes it will accept part of each witnesses' approach to defining and calculating the economic losses suffered by Mrs. Harrison.

Dr. Flexner testified he asked a number of lawyers what "you have to pay a legal secretary today." He said the most conservative estimate he could come up with from talking to many lawyers is that "you have to pay a legal secretary ... around $18,000 a year." He therefore used the $18,000 figure as his base salary figure and made all of his calculations based upon that figure.

Dr. Southard took a different approach. He relied upon "the earnings of Mrs. Harrison at the time of the accident or the disability."

The Court finds the testimony of Dr. Southard to be more credible on this point. Dr. Flexner's survey was somewhat limited and created a more hypothetical than real salary figure. Therefore, the Court accepts and credits the testimony of Dr. Southard on this point because he used Mrs. Harrison's actual income as the base salary figure.

### A. Lost Earnings From 1977 Through 1987

To the base salary, the Court adds a seven percent (7%) annual increase, as Mrs. Harrison's actual annual increases in wages approximates seven percent (7%) from the time she started work in 1967 making three thousand six hundred dollars ($3,600) a year until 1976 making six thousand three hundred dollars ($6,300) a year. Adopting this seven percent increase approach, the Court finds Mrs. Harrison's past lost earnings to be as follows:

| Calendar Year | Salary Plus 7% Annual Increase |
|---|---|
| 1977 | $ 6,741.00 |
| 1978 | 7,212.87 |
| 1979 | 7,717.77 |
| 1980 | 8,258.01 |
| 1981 | 8,836.07 |
| 1982 | 9,454.59 |
| 1983 | 10,116.41 |
| 1984 | 10,824.56 |
| 1985 | 11,582.28 |
| 1986 | 12,393.04 |
| 1987 | 13,260.55 |
| TOTAL | $106,397.15 |

To the total figure, the Court adds fifteen percent (15%) for lost fringe benefits plaintiff would have received had she been able to work and deducts actual earnings plaintiff earned in part-time jobs.

Total Lost Earnings . . . . . . . . . . . . . . . $106,397.15

Plus: 15% Fringe Benefits   15,959.57

Minus: Actual Earnings   (32,130.00)

Minus: Net Difference   (16,170.43)

Total Lost Earnings . . . . . . . . . . . . . . $ 90,226.72

## B. Future Lost Earnings Reduced to Present Value

To calculate future lost earnings reduced to present value, the Court extends the seven percent (7%) increase per annum scheme, which has been utilized to determine Mrs. Harrison's lost earnings from 1977 through 1987. The Court adds fifteen percent (15%) for fringe benefits to the annual salary with the seven percent (7%) increase. The Court finds Dr. Flexner's testimony that the fringe benefits of legal secretaries are about one-third of the annual salary to be too high. The Court also finds Dr. Southard's estimate of total fringe benefits to be approximately nine percent (9%) is below what Mrs. Harrison would have actually received as fringe benefits. The testimony and record indicate the actual fringe benefits paid by Mr. Thompson to Mrs. Harrison included social security payments, life insurance, hospitalization insurance, and vacation. The Court reduces the future lost earnings to present value by adopting Dr. Felxner's approach of using a ten percent (10%) discount factor. The Court finds this testimony to be credible. Applying a ten percent (10%) discount factor to the future earnings Mrs. Harrison would have earned reduces that figure to its present value. The Court therefore finds Mrs. Harrison's future earnings would be as follows:

### PRESENT VALUE OF FUTURE LOST EARNINGS

| Calendar Year | Salary plus 7% Annual Increase | Salary plus 15% Fringe Benefit | 10% Discount Factor | Present Value |
|---|---|---|---|---|
| 1988 | 14,188.79 | 16,317.11 | .9091 | 14,833.88 |
| 1989 | 15,182.01 | 17,459.31 | .8264 | 14,428.37 |
| 1990 | 16,244.75 | 18,681.46 | .7513 | 14,035.38 |
| 1991 | 17,381.88 | 19,989.16 | .6830 | 13,652.60 |
| 1992 | 18,598.61 | 21,388.40 | .6209 | 13,280.06 |
| 1993 | 19,900.51 | 22,885.59 | .5645 | 12,918.92 |
| 1994 | 21,293.55 | 24,487.58 | .5132 | 12,567.03 |
| 1995 | 22,784.10 | 26,201.72 | .4665 | 12,223.10 |
| 1996 | 24,378.99 | 28,035.84 | .4241 | 11,890.00 |
| 1997 | 26,085.52 | 29,998.35 | .3855 | 11,564.36 |
| 1998 | 27,911.51 | 32,098.24 | .3505 | 11,250.43 |
| 1999 | 29,865.32 | 34,345.12 | .3186 | 10,942.36 |
| 2000 | 31,955.89 | 36,749.27 | .2897 | 10,646.26 |
| 2001 | 34,192.80 | 39,321.72 | .2633 | 10,353.41 |
| 2002 | 36,586.30 | 42,074.25 | .2394 | 10,072.58 |
| 2003 | 39,147.34 | 45,019.44 | .2176 | 9,796.23 |
| 2004 | 41,887.65 | 48,170.80 | .1978 | 9,528.18 |
| 2005 | 44,819.79 | 51,542.76 | .1798 | 9,267.39 |
| 2006 | 47,957.18 | 55,150.76 | .1635 | 9,017.15 |
| 2007 | 51,314.18 | 59,010.31 | .1486 | 8,769.08 |
| 2008 | 54,906.17 | 63,142.10 | .1351 | 8,530.50 |
| 2009 | 58,749.60 | 67,562.04 | .1228 | 8,296.62 |
| 2010 | 62,862.07 | 72,291.38 | .1116 | 8,067.72 |
| 2011 | 67,262.41 | 77,351.77 | .1015 | 7,851.21 |
| 2012 | 71,970.78 | 82,766.40 | .0922 | 7,631.06 |
| 2013 | 77,008.73 | 88,560.04 | .0839 | 7,430.19 |
| 2014 | 82,399.34 | 94,759.24 | .0763 | 7,230.13 |
| TOTAL | $1,056,835.77 | $1,215.361.16 | | $286,074.20 |

The testimony and record in this case shows Mrs. Harrison has suffered anguish, humiliation and considerable pain all to a degree words may be inadequate to describe. While the Court must always maintain a professional and objective view of the case and base its finding upon the entire record, nevertheless it is the Court's objective view that Mrs. Harrison suffers disability and will suffer considerable disability for the remainder of her life. She has suffered considerable loss in the enjoyment of her life. She lost many years of the enjoyment a parent experiences with growing children. She has lost much in the enjoyment that comes with a good marriage which existed between her and her husband before trouble came in the form of GBS. The government admits on page 57 in its brief filed July 15, 1986:

> There has not been much proof in this case that Mrs. Harrison underwent a lot of pain and suffering. However, in the area of similar intangible item of damages, she is entitled to compensation for her loss of enjoyment of life. For several years after her illness she was substantially disabled and deserves compensation in a reasonable amount, as the Court sees fit.

The Court finds, upon the entire record in this case, an amount of $250,000.00 for anguish, pain, suffering, humiliation and loss of enjoyment of life to be fair and reasonable.

■ Therefore, after a careful and thorough review of the entire record in this case, the Court concludes Mrs. Harrison should be granted judgment against the United States of America in the sum of $645,786.76, computed as follows:

| | |
|---|---|
| Medical and Mileage Award | $ 19,485.84 |
| Lost Past Earnings | 90,226.72 |
| Lost Future Earnings | 286,074.20 |
| Pain/Suffering & Loss of Enjoyment of Life | 250,000.00 |
| **TOTAL AWARD** | $645,786.76 |