**D.P. MUTH, et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 6:92–0180.

United States District Court, S.D. West Virginia, Parkersburg Division.

Oct. 23, 1992.

Gary E. Pullin, Cleek, Pullin & Bibb, Charleston, W.Va., for plaintiffs.

Christina M. Humway and Paul Yanowitch, Torts Branch, Civ. Div., Washington, D.C., Michael W. Carey, U.S. Atty., Charleston, W.Va., for defendant.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending is the Defendant's motion to dismiss, or in the alternative for summary judgment. Given the volume of exhibits and lengthy oral argument, the Court elects to treat Defendant's request as a motion for summary judgment. The Court grants the Defendant's motion and ORDERS this action dismissed and stricken from the docket of the Court.

### I. FACTUAL BACKGROUND

#### A. Ownership, Contamination, and Remediation

The undisputed facts of this case are rather lengthy and require a thorough examination.

The Plaintiff, D.P. Muth, and his son J.P. Muth[1] own approximately 20 acres of land near the center of what was an 8000 acre complex known as the West Virginia Ordnance Works (WVOW). The WVOW produced trinitrotoluene (TNT) from 1942–45. Following efforts to identify and clean up areas contaminated by TNT byproducts, parcels of the WVOW were sold to private individuals.

The Plaintiff, D.P. Muth, obtained 20 acres of property through four mesne conveyances from the Defendant.[2] Two of these conveyances accounted for over 13 of the Plaintiff's 20 acres. The chain of title for these two conveyances, originating in a conveyance from the Defendant to Jerome and Alma Goldberg, contained the following language:

WHEREAS, said property hereinafter described was formerly a part of the West Virginia Ordnance Works established in 1943 and thereafter developed for the manufacture and production of TNT; and

WHEREAS, a part of such property was subject to contamination during the manufacture of TNT by the deposit of dangerous explosive materials on the surface of the ground and buried in the ground; and

WHEREAS, in accordance with said agreement, [Goldberg] caused the property to be inspected and decontaminated to the extent deemed reasonably necessary in cooperation with and under the direction and supervision of trained personnel ...;

WHEREAS, upon completion of the decontamination of the land a certificate was issued by the [Army] ... stating as follows:

The TNT area ... has been decontaminated in accordance with [certain procedures] and in the opinion of the undersigned, no significant hazard remains which will prevent the surface use of the area for non-military purposes or endanger the lives of individuals or the public....

WHEREAS, the [grantor] by attaching such certificate does not intend to make, nor shall it be construed to have made, any representations or warranties pertaining to the condition of the land; and

WHEREAS, [Goldberg] has evinced his desire to purchase such property with full knowledge of, and notwithstanding the foregoing recitals which are incorporated herein for the purpose of disclosing the former use made of the property hereinafter described....

THIS QUITCLAIM DEED is executed and delivered to [the Goldbergs] without representations, warranties or covenants, either express or implied and by the acceptance of this instrument, the [Goldbergs] admit and confess to full

---

1. Prior to bringing an action against the United States, all claimants under the Federal Tort Claims Act (FTCA) must first present an administrative claim to the appropriate federal agency. 28 U.S.C. § 2675(a) (1988). The filing of an administrative claim is jurisdictional and cannot be waived. *Henderson v. United States*, 785 F.2d 121, 123 (4th Cir.1986); *Kielwien v. United States*, 540 F.2d 676, 679 (4th Cir.), *cert. denied*, 429 U.S. 979, 97 S.Ct. 491, 50 L.Ed.2d 588 (1976). If there are multiple claimants in an action, "each claimant must ... satisfy the jurisdictional prerequisite of filing a proper claim unless another is legally entitled to assert such a claim on their behalf." *Frantz v. United States*, 791 F.Supp. 445, 447 (D.Del.1992); *see Estate of Santos v. United States*, 525 F.Supp. 982, 986 (D.P.R.1981).

J.P. Muth is listed as a Plaintiff in this action. The record reveals that while D.P. Muth filed an administrative claim in this matter, no such claim was filed by J.P. Muth. The Defendant raised this problem in its briefs, but Plaintiffs did not offer evidence to the contrary in their response or oral argument. Therefore, J.P. Muth has failed to fulfill a jurisdictional prerequisite to the prosecution of this action, and the Court dismisses him as a party according to Federal Rule of Civil Procedure 12(h)(3).

2. The four conveyances which make up the Plaintiff's 20 acre parcel were originally made to Mason Furniture Corporation (MFC)—a business which Plaintiff owned and operated from 1948–76. The conveyances comprising the Plaintiff's approximately 20 acres are as follows: Parcel One—5.197 acres in 1948 from the Defendant; Parcel Two—.477 acres in 1951 from the Defendant; Parcel Three—5.026 acres in 1966 from G.P.B. Trading Company (surface only); and Parcel Four—8.23 acres in 1973 from G.P.B. Trading Company (surface only). In 1988, all of the above parcels were deeded to the Plaintiff and J.P. Muth by MFC.

knowledge with respect to the facts ... as to the possible contaminated condition of the property ...

This deed also contained an indemnity clause and language stating that while surface use of the property was deemed reasonably safe, "[s]ubsurface use [could not] be assured."

In May, 1981, certain areas of the former WVOW were found to be contaminated with byproducts of the TNT manufacturing process.[3] After investigating the contamination, the Environmental Protection Agency (EPA) listed the WVOW on the National Priorities List.[4] The United States Army's Toxic and Hazardous Materials Agency (USATHAMA) was designated as the agency responsible for investigation and remediation at the WVOW.

Between 1984 and 1986, the USATHAMA conducted a remedial investigation at the WVOW site. This investigation included the installation and sampling of various water wells, two of which were located on Plaintiff's property. In 1986 the Remedial Investigation Final Report (RIFR) was published and disseminated by the USATHAMA. The report showed no nitroaromatic contamination of Plaintiff's wells but did document contamination in areas within one quarter mile of Plaintiff's property.

Following the disclosure of the contamination, the Defendant held four public meetings to address citizen concern about possible contamination and to solicit community input and comment. These meetings received considerable local and state-wide news coverage. *See, e.g.,* Jeff Morris, *No Imminent Hazard at McClintic— Army,* Point Pleasant Register, Aug. 29, 1984, at 1; *Hearing Set Today on Site Cleanup,* Charleston Daily Mail, Oct. 13, 1987, at 7A.

The Defendant also set up a repository in the Plaintiff's county library which contained, among other things, all reports issued on the testing and remediation at WVOW. These documents included information on the nitroaromatic contamination located only one quarter mile from the Plaintiff's property.[5]

During 1989 and 1990, a supplemental investigation of the WVOW and Plaintiff's property was conducted. This investigation included the taking of 22 soil samples and various water samples from three wells on the Plaintiff's property. The sites of such samplings were selected by the Plaintiff. The USATHAMA concluded that both the soil and water samples did not contain any nitroaromatic contamination.[6]

## B. Correspondence

A great deal of correspondence was generated by the parties in this case. However, three letters generated by D.P. Muth are most helpful in resolving the issues presented herein. On September 19, 1988, over two years before filing his administrative complaint, Plaintiff wrote identical letters to Mr. Andrew Anderson, an official with the USATHAMA, and Mr. Jim Seif of the EPA. The letters contained the following selected phrases:

3. The "contaminants" found will be referred to herein as nitroaromatic compounds.

4. The National Priorities List is authorized by 42 U.S.C. § 9605(8)(B) (1988) and designates the top 100 sites chosen for cleanup by the EPA. After placement on the list, the site is investigated and appropriate remedial action is performed. *Id.* at § 9604.

5. Additionally, such documents were sent to the Plaintiff by the USATHAMA in a letter dated February 28, 1989. The letter stated that the materials sent contain information on "water samples taken from the [Plaintiffs' property], wartime use of this land, and additional data from adjacent areas."

6. The initial tests of the wells in April, 1990 returned negative for the presence of nitroaromatic compounds. A resampling in July, 1990 confirmed these results, but one well sample showed the presence of a nitroaromatic compound slightly above the detection limit for the compound. However, the Army concluded that

"[d]ue to the solitary occurrence and extremely low concentration measured, it is unlikely that this compound is actually present in the ground water sample. A possible explanation for this situation is detection of carryover from a standard run immediately before the sample during the analysis."

U.S. Army Corps of Engineers, Supplemental Investigation West Virginia Ordnance Works Final Report 3–12 (1991).

"I was not aware of the serious situation that exists on the former WV Ordnance property and the Mason County Industrial Park.

. . . .

My property is directly in the center of, and part of the old Ordnance property and adjacent to . . . the Industrial Park. *Pond 13 lies east of my property and the Industrial Park property lies North and West of my property. I understand that there is contamination in what I refer to as Acid Area # 2 and which has appeared in Pond 13.*

I would like to advise that my property is adjacent to Acid Area # 1; and I also wish to advise you that foundations and part of the Cellite Plant is still present on my property.

The Cellite Plant consisted of a mixing plant where there was once chemicals mixed and then pumped into two (2) large tanks (300,000 gallons each). One tank is still on the grounds. From here this material was pumped in the direction . . . under ground. These pipes have never been removed or tested.

The company that sank your 50+ wells a few years ago used my property as their base of operation. . . .

*I understand the poison was found in the first aquifer on the Industrial Park.*

*$I request that you check my property on the first aquifer to see if the water is poison.*

This past week I offered my property for the new industrial park and *I was told by the management of the present Industrial Park that property in the old TNT plant site was not desirable for any industry or an industrial park "*

(emphasis added).

The EPA and USATHAMA responded to Plaintiff's letter and, consistent with the

RIFR, detailed why no contamination was found or anticipated on his property.[7]

Plaintiff replied to the USATHAMA in a letter dated December 5, 1988:

*The situation that exists on the Industrial Park on this site has alarmed people in the area.* Based on your letter to me that my property is not a dangerous situation, I have made a direct offer to the Mason County Development Authority . . . to consider my property for the future industrial site. *They immediately advised me that they consider any property of the Old [WVOW] as undesirable for anything.*

I would like to request your office to give me a letter stating that this property is *not a hazardous situation and I would also appreciate your expertise in examining the surface ground and the 1st and 2nd Aquifer flow.*

[Since last week], I approached real estate parties and put my property on the market for sale or lease. However, *the real estate people have informed me it will be difficult to dispose of this property because of the contamination found on the former West Virginia Ordnance site* [8]

(emphasis added).

The third letter in this series was sent by Plaintiff to Senator Robert Byrd on January 9, 1989. In this letter Mr. Muth mentions that 50 acres of property adjacent to his land were condemned by the Defendant as "hazardous and dangerous." Further, he states that potential buyers of the property told him that "any property of the former [WVOW] is undesirable and unsafe for anything." Finally, Plaintiff asked Senator Byrd to have the Army check soil and water samples on his 20 acres of land.

After a great deal more correspondence with government officials and elected representatives, the Plaintiff filed his administrative complaint with the Army on July 19,

7. The letter from USATHAMA also directed Mr. Muth to news releases regarding public meetings on the problem and the documents depository at the public library.

8. The USATHAMA responded to Mr. Muth's letter on December 14, 1988. In this response, Mr. Muth was told that an assessment of risk to his property was given to him in previous correspondence. Mr. Muth was also told that any requests for additional testing or analysis should be directed to the EPA.

1991. The claim was denied on September 25, 1991, and Plaintiff filed the instant action in this Court on March 5, 1992. The Plaintiff's complaint alleged that as a result of the negligent contamination of the WVOW in the 1940s, his property has diminished in value, effectively rendering it economically worthless.

The Defendant seeks summary judgment on the grounds that the FTCA statute of limitations for this action, 28 U.S.C. § 2401(b) (1988), has expired. The Plaintiff argues that his cause of action is timely because he acted with due diligence and/or the principle of equitable tolling extended the time which he had to file his claim.

## II. THE STATUTE OF LIMITATIONS

### A. Section 2401(b)

■ It is well-settled that the Defendant, as sovereign, is immune from suit unless it consents to such; the terms of this consent define a court's jurisdiction to hear a claim against the sovereign. *United States v. Sherwood*, 312 U.S. 584, 61 S.Ct. 767, 85 L.Ed. 1058 (1941). Congress provided a limited waiver of sovereign immunity in the FTCA. *See* 28 U.S.C. §§ 2671–80 (1988). One condition of this waiver is that a plaintiff proceeding under the FTCA must comply with the relevant statute of limitations contained in 28 U.S.C. § 2401(b).[9] Section 2401(b) provides

"A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim *accrues....*"

28 U.S.C. § 2401(b); *see Gould v. Department of Health and Human Serv.*, 905 F.2d 738, 741 (4th Cir.1990), *cert. de-*

nied, —— U.S. ——, 111 S.Ct. 673, 112 L.Ed.2d 666 (1991).

■ Federal law determines when a claim "accrues" under § 2401(b). *Miller v. United States*, 932 F.2d 301, 303 (4th Cir. 1991); *Gould*, 905 F.2d at 742. A claim accrues under the FTCA "when the plaintiff knows or, in the exercise of due diligence, should have known both the existence and the cause of his injury."[10] *Gould*, 905 F.2d at 742; *see United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979).

■ Plaintiff's administrative complaint was filed with the Army on July 19, 1991. Therefore, if Plaintiff's claim accrued prior to July 19, 1989, his action is barred by § 2401(b). The Plaintiff has identified his "injury" as the diminution in value of his land. The "cause" of such diminution in value can be characterized as the contamination of surrounding and adjacent properties.

In relation to Plaintiff's injury of diminished property value, Plaintiff D.P. Muth's letters, dated no later than February, 1989, mention some of the statements that were made by potential buyers: "property in the old TNT plant site [is] not desirable for any industry or an industrial park;" "[we] consider any property of the Old [WVOW] as undesirable for anything;" "any property of the former [WVOW] is undesirable and unsafe for anything." No "due diligence" inquiry into whether Plaintiff should have known of his injury is necessary under these facts; Plaintiff, by his own admission, *knew* of the diminished value of his property, at the latest, in February, 1989.

---

**9.** Limitation periods such as § 2401(b) indicate a balanced legislative determination; plaintiffs receive a reasonable time to sue and defendants receive protection from stale claims which might result in the loss of evidence and failure of memories. *United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979) (citations omitted).

**10.** Somewhat equivocal language in the case of *United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979) suggests that a plaintiff in a nonmedical malpractice case may have

even less time to file his or her claim. The Court did not explicitly disagree with the lower court's proposition that

the general rule under the Act [for nonmedical malpractice claims] has been that a tort claim *accrues at the time of the plaintiff's injury....*

*Id.* at 120, 100 S.Ct. at 358.

The Court need not address this issue as it finds the Plaintiff's claim barred by even the more generous "discovery rule" formulation discussed in *Kubrick*.

844

In relation to the cause of Plaintiff's injury—the contamination of surrounding and adjacent properties—Plaintiff's letters are also instructive. As the letters above detail, he was aware in September 1988 of the "serious situation" that existed at the WVOW. He discusses the "contamination" and "poison" found throughout the WVOW and states that his property is "directly in the center of" the WVOW. Again, Plaintiff's own admissions no later than February, 1989 show that he clearly knew the cause of his property's diminished value—the contaminated nature of adjacent properties.

Since Plaintiff knew of his injury and its cause, at the latest, in February, 1989, his cause of action under the FTCA accrued at that time. The administrative complaint was filed in July, 1991, over two years after the accrual of his cause of action. Thus, the Plaintiff's claim is barred by the applicable FTCA statute of limitations contained in § 2401(b).

The Court notes that Plaintiff's response motion has attempted to recharacterize his "injury" and/or its "cause" as the actual contamination of his own property. The argument seemingly goes that since actual contamination of the property was not discovered until recently,[11] the injury and/or cause prongs of the *Gould* test have not been established, and, therefore, the accrual of the statute of limitations was delayed. This position as to the injury prong is clearly untenable. Such an approach is inconsistent with Plaintiff's own pleadings and interrogatories in this case. While the complaint does allege contamination of Plaintiff's property and surrounding property due to the Defendant's negligence, the gravamen of the pleading is clearly the injury resulting in the reduced value and unmarketability of Plaintiff's land. *See* Pls.'

Compl., ¶¶ 9, 10, 12–14. Further, the Plaintiff clearly identifies his injury in the following excerpt from the Defendant's first set of interrogatories:

*INTERROGATORY 1:* separately identify:

d) the *specific injury* or damage to you and/or your property *as a result* of each and every act or omission identified in subpart (a);

. . . .

*RESPONSE:*

d) The plaintiffs' property has been rendered of no economic value *as a result of* the contamination surrounding, on and adjacent to the plaintiffs' property.

This response demonstrates that while one of the causes of Plaintiff's injury may have been the contamination of Plaintiff's land, the injury complained of is clearly the diminution in value of Plaintiff's land.

Second, Plaintiff's assertion that he did not know the cause (again denominated as the actual contamination of his land) of his injury until after July, 1989, does not meet the standard for determining the accrual of an FTCA cause of action. This standard states that accrual occurs when the plaintiff knows, or in the exercise of due diligence should have known, of his injury and its cause. *Gould,* 905 F.2d at 742.

Deeds in the Plaintiff's chain of title comprising over 13 of Plaintiff's approximately 20 acres reference the prior use and contamination of the land, possible contamination of the subsurface, and the Defendant Grantor's refusal to warrant the condition of the property in any manner. Further, the 1988 and early 1989 correspondence of the Plaintiff, as analyzed above, indicates a thorough understanding of the activities at the former WVOW[12] and

---

11. As noted elsewhere in this opinion, it is still unclear as to whether Plaintiff's property is actually contaminated. *See supra* at note 6 and *infra* at note 13.

12. One might even contend that Mr. Muth possessed knowledge of the WVOW activities superior to that of the investigating agencies. For instance, Mr. Muth's letter to the Army of September, 1988 stated as follows:

The Cellite Plant consisted of a mixing plant where there was once chemicals mixed and then pumped into two (2) large tanks (300,000 gallons each). One tank is still on the grounds. From here this material was pumped in the direction ... under ground. These pipes have never been removed or tested.

In another letter dated September 5, 1989, Mr. Muth states that "I told [an apparent Army rep-

knowledge of the serious contamination of properties immediately adjacent to him. No weighing of the evidence is warranted. The Court concludes as a matter of law that Plaintiff in the exercise of due diligence, should have known of any contamination of his land no later than February, 1989. *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) ("where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial' ").

### B. Equitable Tolling

The Plaintiff maintains that the doctrine of equitable tolling should be employed by the Court to extend the filing time contained in § 2401(b). The crux of the Plaintiff's argument is that while the Army repeatedly told him that no contamination existed on his property, results of a 1991 test of the Plaintiff's property now show evidence of contamination.[13]

■ Equitable relief from untimely filings of claims is granted only sparingly. *Irwin v. Veterans Admin.*, 498 U.S. 89, ——, 111 S.Ct. 453, 457, 112 L.Ed.2d 435 (1990). Such equitable relief "is reserved for only the most deserving complainants." *Polsby v. Chase*, 970 F.2d 1360, 1363 (4th Cir.1992). There is a heavy burden on a plaintiff seeking equitable tolling: he must show that "the defendant attempted to mislead him and that the plaintiff reasonably relied on the misrepresentation by neglecting to file a timely charge." *English v. Pabst Brewing Co.*, 828 F.2d 1047, 1049 (4th Cir.1987), *cert. denied*, 486 U.S. 1044, 108 S.Ct. 2037, 100 L.Ed.2d 621 (1988). Further, another limitation on the use of equitable relief states that "[o]ne who fails to act diligently cannot invoke equitable principles to excuse that lack of diligence." *Id.* (citing *Baldwin County Welcome Ctr. v. Brown*, 466 U.S. 147, 151, 104 S.Ct. 1723, 1725, 80 L.Ed.2d 196 (1984)).

■ Regarding any intentional misleading by the Defendant, the Court has grave concerns about the Plaintiff's ability to meet his burden on the undisputed facts. Such an inquiry is unnecessary though. The undisputed facts lead the Court to conclude that Plaintiff failed to act with due diligence in this matter. This lack of due diligence precludes granting the Plaintiff's request for equitable relief. As discussed more fully above, Plaintiff exhibited a thorough understanding of the activities at the former WVOW and knowledge of

---

resentative that] I personally observed the removal of the large lead lined tanks back in the 1950's. Also, I can show you the Acid Line Pipes which are still on my property."

**13.** A brief explanation of this alleged finding of contamination is in order. The results of Army testing of the Plaintiff's land in 1990 were released in March, 1991. U.S. Army Corps of Engineers, Supplemental Investigation West Virginia Ordnance Works Final Report (1991). The low level finding of nitroaromatic compounds in one water sample from Plaintiffs' well is discussed *supra* at note 6.

· The 1990 testing of Plaintiff's soil also revealed elevated levels of the following metals: copper, thallium, lead, and sulfate. Plaintiff concludes that:

this information represents the first time that the plaintiffs had the opportunity to know that the MFC property had been contaminated.... Through either concealment or by a lack of knowledge [by the Army] the plaintiffs had been continually informed ... that the MFC property was not contaminated.

Pls.Resp.Mem. at 15.

This conclusion contradicts the undisputed facts. A 1986 Army report, which D.P. Muth received a copy of in February, 1989, disclosed that detectable levels of sulfate, chromium, lead, and nickel were found in water samples of Plaintiffs' wells. Environmental Science and Engineering, Inc., West Virginia Ordnance Works Remedial Investigation Final Report 5–276 to –77 (1986). In a November, 1988 letter to Plaintiff, the Army noted that "[T]he sulfate level in one of your wells was slightly above the [recommended level] of 250,000 micrograms per liter." Finally, in July, 1985, the West Virginia Department of Natural Resources notified D.P. Muth that levels of iron and sulfate above drinking water standards were detected in his wells. As to the other three metals found during the 1990 testing, the Plaintiff's claim of "contamination" is misleading. The Army concluded

Results of [testing] indicate no significant soil contamination at [Plaintiffs' property] by military or private industrial contaminants.... [S]everal metals were detected in the soil samples. *There are currently no applicable regulatory criteria or maximum contaminant levels ... for metals in soils. The metals detected in the MFC soil samples can occur naturally in clayey soils.*

the serious contamination of properties immediately adjacent to him. Plaintiff's failure to diligently investigate the possible contamination of his own property cannot now excuse the untimely filing of his claim. Incredibly, the record to date indicates that Plaintiff has yet to seek independent testing of his property—even though he noted the need for testing of his property in 1988 and early 1989.[14] *See Kubrick*, 444 U.S. at 122, 100 S.Ct. at 359 ("The prospect is not so bleak for a plaintiff in possession of the critical facts that he has been hurt and who has inflicted the injury. He is no longer at the mercy of the [defendant]. There are others who can tell him if he has been wronged, and he need only ask").

### III. CONCLUSION

The Court concludes that there is no genuine issue of material fact and that the Defendant is entitled to judgment as a matter of law. Therefore, the Court GRANTS Defendant's motion for summary judgment and ORDERS that this action be dismissed and stricken from the docket of the Court.

---

**14.** At oral argument, the Plaintiff introduced recently discovered documents prepared by the Defendant. These documents were generated by the EPA in September, 1992, and criticized the USATHAMA's investigation of the WVOW area. Specifically, the EPA contends that the detection limits for certain compounds were too high, leading to questionable results for contamination testing.

This does not change the equitable tolling analysis. The fact remains that Plaintiff, in the exercise of due diligence, should have known of his injury and its cause in February, 1989, at the latest. For instance, had Plaintiff sought independent analysis of the Army's methods at the time his cause of action accrued, he likely would have been apprised of any problems with the detection limits. Plaintiff chose to take a different course, however, and his lack of due diligence precludes his attempt to rely on equitable considerations.