**Lizzie Ethel KIELWIEN, Appellee,**

v.

**UNITED STATES of America, Appellant.**

**No. 74–1696.**

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 11, 1975.

Decided April 22, 1976.

Certiorari Denied Nov. 29, 1976.
See 97 S.Ct. 491.

---

Div., U. S. Dept. of Justice, Washington, D. C., on brief), for appellant.

Terrell L. Glenn, Columbia, S. C. (Richard L. Sullivan, Columbia, S. C., Moss, Carter, Branton & Bailey, Beaufort, S. C., Glenn, Porter & Sullivan, Columbia, S. C., on brief), for appellee.

Before BOREMAN, Senior Circuit Judge, RUSSELL and FIELD, Circuit Judges.

DONALD RUSSELL, Circuit Judge.

The issue in this appeal is whether the District Court, having found that the United States was liable under the Federal Tort Claims Act,[1] was clearly erroneous in finding that there was an "intervening fact" permitting recovery by the plaintiff in excess of the amount fixed by her in her administrative claim as filed with the Government under the requirements of 28 U.S.C. § 2675(a) and (b). We conclude that such finding was clearly erroneous and accordingly remand the cause to the District Court with direction that the judgment awarded be corrected by limiting the recovery to the amount stated in plaintiff's claim as filed under § 2675(a), 28 U.S.C.

The plaintiff is the wife of a Marine Sergeant. At the time involved here, she lived near the Parris Island Marine base at Beaufort, South Carolina. On October 1, 1970, she was admitted to the United States Naval Hospital at Beaufort for the removal of a lump on her neck. Immediately after the operation, she noticed that she "couldn't get [her] left arm up" and that her left shoulder "seemed to be drooping." [1a] When she returned home after the operation, this condition continued; in fact, the "drooping" of her shoulder was such that she "couldn't keep [her] bra strap up." She visited the hospital a number of times to complain of these difficulties and to seek relief. It was suggested to her at first by the examining physician that her condition represented normal post-operative symptoms, which,

Richard A. Olderman, Atty., Appellate Section, Civ. Div., U. S. Dept. of Justice, Washington, D. C. (Rex E. Lee, Asst. Atty. Gen., Mark W. Buyck, Jr., U. S. Atty., William Kanter, Atty., Appellate Section, Civ.

1. 28 U.S.C. § 1346(b).

1a. In answer to an interrogatory filed in this proceeding, the plaintiff stated that "[a]ll of these problems [disabilities] manifested themselves immediately after the operation" and were "permanent."

with time, should disappear. Because of the continuance of her problems, however, she was given further examinations in January, 1971, and was advised to take physical therapy. After about four or five treatments, the physical therapist sent her back to the surgeon who had operated on her and she was examined and advised that she had "either a nerve problem or a muscle problem." She was then referred to a neurologist, Dr. Feller, at the Charleston Naval Hospital for further examination.

On February 24, 1971, she was seen by Dr. Feller, who, at the completion of his examination, told her that her left spinal accessory nerve had been either severed or injured, presumably in the operation, and recommended exploratory surgery. She reported back to the surgeon in Beaufort who then referred her to Dr. Baird, a neurosurgeon at the Charleston Naval Hospital. After examination on March 30, 1971, Dr. Baird told her that he would not advise surgery, that she was "partially paralyzed," that such condition was permanent and that any attempt to repair the nerve would only mean she "could possibly come out more paralyzed." The same problems continued and she was referred to Dr. Herring, an orthopedist, who, on August 30, discussed with her the practical possibilities of an operation to reconstruct the back muscles, in the hope of "help[ing] with the movement of [her] arm and some of the pain." Dr. Herring brought a Dr. Barone, a private neurosurgeon, into consultation. Dr. Barone examined the plaintiff on September 7, 1971, after this examination, the plaintiff was told by Dr. Barone what Dr. Baird had previously told her, that "surgery on the nerve" was out of the question and when she saw Dr. Herring later, he told her that so far as any effort to improve her condition, through an operation to construct her back muscles, that operation would repre-

sent "major surgery," which he as an orthopedic surgeon had never attempted, and that there "was no guarantee at all that it would even be successful." The plaintiff testified that Dr. Barone told her at this time that she was "going to have to live with the pain."[2] After receiving this advice, the plaintiff expressed no desire to have the muscle operation.

About this time the plaintiff engaged counsel to prosecute a claim against the defendant. Prior to this, all physicians, who had treated the plaintiff or had been consulted by her, had been either in the naval service or engaged by the Government to examine and treat the plaintiff. Her counsel, however, determined to have her examined by a private neurosurgeon in Charleston, Dr. Luther Martin. The plaintiff saw Dr. Martin on September 10, 1971. She gave him the same symptoms that she had previously given the other physicians. After examining her, Dr. Martin told her that her injuries were permanent but indicated that two operative procedures might be attempted. Neither, however, in his opinion would give relief.[3] The first would be an operation whereby the suturing of the severed nerve would be accomplished, an operation that he would not favor[4] and the other was the possible restructuring of the back muscles. Dr. Martin, however, said that he was "very skeptical about" this second operation, that he didn't think it "a very practical procedure" and that, in his opinion, there was "unlikelihood of success" in such an operation. Dr. Martin provided a written opinion to this effect to the plaintiff's counsel on September 23, 1971. In this letter, he repeated that he did not "know of any treatment which would benefit the patient other than the possible exploration of the left side of the neck with an attempt to suture the nerves" or the "possibility [of] * * * some type of re-

---

2. Transcript, p. 262.

3. *See* page 23, Transcript.

4. Dr. Martin testified that he had no knowledge of any successful operation of this kind ever being performed. Pages 109–10, Transcript.

There was some evidence that such operation, to have any promise whatsoever of success, must follow closely after the severing of the nerve itself. The reason for this opinion is the increased atrophy that follows with the passage of time.

constructive surgery to the left shoulder muscle." He expressed, however, "doubt that either of these procedures would be of very much benefit to the patient." [5]

On the basis of Dr. Martin's report and the advice received by her from the other doctors who had seen her, the plaintiff filed her administrative claim with the Department of Navy, under date of October 1, 1971, for personal injury, fixing the amount of her claim as $25,000. In this claim she described her injury as arising out of an operation, in the course of which her "spinal accessory nerve was severed leaving drooping left shoulder and permanent disability to the left arm." [6] When no action was taken on her claim, plaintiff filed this action on August 24, 1972. In her complaint the plaintiff alleged that her injuries resulted from the negligence of the physicians who operated on the plaintiff and who owed the duty to treat her after the operation. She made no reference to the administrative claim she had filed other than an averment that she had exhausted administrative remedies under § 2675, 28 U.S.C.

After a trial, the District Court found as a fact (1) that the plaintiff's injuries were caused by the negligence of the Government's agents; [7] (2) that the plaintiff was not limited in her right to the maximum amount stated in her claim because of "intervening facts relating to the amount of the claim" and the extent and permanency of her injuries; [7a] and (3) that the plaintiff was entitled to judgment in the sum of $123,578.90. The District Court did find that the extent and permanency of plaintiff's injuries were not based "upon newly discovered evidence not reasonably discoverable at the time of presenting the claim" to the Government.

The Government has appealed. It does not challenge the finding of negligence; its appeal raises the single issue whether the District Court committed clear error in finding that the plaintiff both alleged and proved "intervening facts" justifying under § 2675(b), 28 U.S.C., a recovery by the plaintiff in excess of the maximum amount set forth in the claim she filed with the Government.

The right to sue the Government exists wholly by consent as expressed in § 2675, 28 U.S.C., which fixes the terms and conditions on which suit may be instituted. The first requirement is the filing of a claim. That requirement is jurisdictional and is not waivable. *Provancial v. United States* (8th Cir. 1972) 454 F.2d 72, 74; *Driggers v. United States* (D.S.C.1970) 309 F.Supp. 1377, 1379–80; *Hlavac v. United States* (D.Ill.1972) 356 F.Supp. 1274, 1276; *Robinson v. United States Navy* (E.D.Pa. 1972) 342 F.Supp. 381, 382–3; *Goodman v. United States* (M.D.Fla.1971) 324 F.Supp. 167, 170, aff'd 455 F.2d 607. The statute further provides that no action shall be instituted "for any sum in excess of the amount of the claim presented to the federal agency." The statute, however, includes an escape clause with reference to this *ad*

---

5. In a subsequent letter dated March 14, 1973, he was quite specific that he knew of no "specific treatment which would be of benefit to the patient" and that plaintiff's injuries represented "a condition that the patient will have to learn to live with and will cause her considerable disability and pain for the remainder of her life."

6. At one point, the plaintiff argued that the administrative claim was not properly in the record, never having been offered in evidence by the defendant. The obligation to prove the claim rested not on the defendant but on the plaintiff. It was an essential part of her case. Its presence in the case is jurisdictional. For the plaintiff to deny proof of such claim would be to undercut her right to sue at all. However, both the parties have acted upon the presence in the record of the claim and both are precluded from denying the inclusion in the record of the claim.

7. It is not to be assumed from this that the issue of liability was conceded. Liability was hotly disputed during the trial; considerable testimony was introduced on the issue; and the liability of the United States could have been decided either way. The District Court, however, found for the plaintiff and that finding cannot be faulted as clearly erroneous. It was no doubt recognition of this fact that lead the Government not to appeal the issue of negligence.

7a. *See* § 2675(b), 28 U.S.C.

*damnum* limitation. It adds that a plaintiff may sue for a sum greater than that stated in his or her claim if "the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts, relating to the amount of the claim." The burden of establishing such "newly discovered evidence" or "intervening fact," it has been held, rests on the claimant-plaintiff. *Smith v. United States* (D.Md.1965) 239 F.Supp. 152, 154. The District Court found, and there is no appeal from such finding, that the plaintiff, though failing to sustain the burden of establishing that the "increased amount" claimed by the plaintiff was "not reasonably discoverable at the time" she presented her claim, had sustained her burden in establishing "intervening facts relating to the amount of the claim," entitling her to judgment in excess of the amount stated in her claim. It is this latter finding which is challenged. We are of the opinion that the District Court's finding that the plaintiff had proved "intervening facts" which would justify judgment in excess of the amount of her claim was clearly erroneous.

It is the plaintiff's contention that she did not know the full extent of her injuries or their permanent nature until she visited Bethesda Naval Hospital in December, 1971 and February, 1972, and was told by Dr. Brown, an orthopedist, in the presence of his superior, Dr. Wilson, that neither "neck surgery" nor "muscle surgery," in his opinion, would "help" her. It was this advice, received some four months after she had filed her claim, which constitutes the "intervening fact" which plaintiff asserts, and the District Court found, justifies her right under the statute to recover more than the amount stated in her claim. Dr. Brown's diagnosis of the plaintiff's condition was, though, the same as the plaintiff had been repeatedly given by other physicians from February, 1971, on. As we have seen, she was told by Drs. Feller, Baird, Herring, Barone and Martin—all before she filed her claim—that she had a permanent disability, that she was paralyzed and that there was

no form of surgery that, in the words of Dr. Martin, offered "a very practical procedure" in an attempt to relieve even partially her disability. Dr. Wilson's and Dr. Brown's opinions were merely confirmation of what plaintiff had already been told, not once but repeatedly by other physicians and surgeons, including one privately employed, before she filed her claim. Their diagnoses and advice were thus cumulative and confirmatory of what plaintiff had largely already been told. Their diagnoses could not be considered an "intervening fact" within the meaning of § 2675(b).

This case is quite different factually from those cited and relied on by the plaintiff. In *United States v. Alexander* (5th Cir. 1956) 238 F.2d 314, the plaintiff, unlike the claimant here who filed her claim almost a year after her injury, filed his claim some six weeks after his shoulder injury. During the time the agency was considering his claim, the claimant in that case on several occasions advised the agency that his injury was more serious than originally contemplated. He later was told for the first time that his shoulder would only mend after surgery. The District Court found this to be either "newly discovered evidence" of the extent of his injury or an "intervening fact, relating to the amount of his claim," and this finding was sustained on appeal. The claimant's case here is, however, the opposite of that of the claimant in *Alexander*. She knew some eight months before she filed her claim the extent and permanency of her disability and the "unlikelihood of any relief." In *Rabovsky v. United States* (D.Conn.1967) 265 F.Supp. 587, the plaintiff "through no fault of his own" was unable to secure from his doctor a statement of his condition before he filed his claim and he so advised the agency when he filed his claim. The fact that it was only later that by due diligence he was able to secure an opinion on "[t]he medical extent of his injuries and expenses" was sufficient to bring him within the exception of § 2675(b). In this case, though, the plaintiff had repeated medical advice on the extent of her injuries prior to the filing of

her claim. *Joyce v. United States* (W.D.Pa. 1971) 329 F.Supp. 1242, *vacated on other grounds* 474 F.2d 215, is similar to *Rabovsky.* There, "[t]he initial claim was made to the administrative agency within days of the injury, at a time when the full benefits of medical diagnosis were not available" and when "the full extent of his injuries * * * are such that medical science [could not] immediately establish them."[8] In *Bonner v. United States* (E.D.La.1972) 339 F.Supp. 640, it was found that the plaintiff did not know the diagnosis of her condition when she filed her claim because "neither plaintiffs nor their counsel could reasonably have known the medical extent of Hazel Bonner's disability at the time of the administrative claim."[9] That is not this case.

We find no difference between this case and innumerable others where the claimant has been limited in his or her recovery by the amount fixed in his or her administrative claim. *See Schwartz v. United States* (3d Cir. 1971) 446 F.2d 1380; *Smith v. United States, supra; Nichols v. United States* (E.D.Va.1957) 147 F.Supp. 6; *Corkle v. United States* (D.S.C.1951) 94 F.Supp. 908; *Menclewicz v. United States* (W.D.N.Y.1953) 116 F.Supp. 847; *Morgan v. United States* (S.D.N.Y.1954) 123 F.Supp. 794. The Federal Tort Claims Act is remedial and should be liberally construed to grant the relief contemplated by Congress; but, as the Court said in *Nichols v. United States, supra,* at p. 10, "[t]he statute, 28 U.S.C. § 2675(b), would be meaningless if claimants, after rejection of their claim, could institute actions for amounts in excess of the claim filed merely because they, or their attorneys, are of the opinion that the claim has a greater value" and that is about the extent of the proof of an "intervening fact, relating to the amount of the claim" in this case.

The cause is remanded to the District Court with instructions to reduce the amount of plaintiff's recovery, as allowed by the judgment entered, to the maximum amount claimed in her administrative claim.

REVERSED AND REMANDED WITH DIRECTIONS.

---

8. 329 F.Supp. at 1247–8, *supra.*

9. 339 F.Supp. at 651.