**Marie Rosalind Salcedo HOEHN, Individually and as Mother of her minor daughter Victoria Hoehn, by and through her co-guardians Maria Mikitka and Preciosisima Salcedo, and Gary Hoehn, Father of his minor daughter Victoria Hoehn, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. Civ.A. 01–1450(JDB).

United States District Court, District of Columbia.

Aug. 8, 2002.

 

Michael Allen Abelson, Washington, DC, for Plaintiffs.

Thomas M. Ray, Joel E. Wilson, U.S. Attorney's Office, Washington, DC, for Defendant.

### *MEMORANDUM OPINION*

BATES, District Judge.

This negligence action under the Federal Tort Claims Act ("FTCA") arises out of an automobile accident in which a patient at Walter Reed Army Medical Center ("WRAMC") lost control of her vehicle while driving home from the hospital following chemotherapy treatment, and collided with a vehicle in which plaintiffs Marie Rosalind Salcedo Hoehn and Victoria Hoehn were passengers. Plaintiffs allege that WRAMC was negligent in permitting the patient, allegedly without adequate warning, to drive home following the administration of intravenous drugs allegedly known to cause drowsiness.

Defendant United States of America moves to dismiss the complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief may be granted. The case, and defendant's motion, raises a novel and important issue of first impression under District of Columbia law: does a hospital or physician owe a duty to the general public either to control a heavily medicated patient by preventing her from driving an automobile upon discharge or to warn the patient about the danger of driving? For the reasons stated below, the motion is granted in part and denied in part.

### FACTUAL AND PROCEDURAL BACKGROUND

Emiko Wiscott, a seventy-year-old breast cancer patient at WRAMC, was scheduled to receive her first chemotherapy treatment on October 30, 1998. Complaint ¶ 9. A week beforehand, Mrs. Wiscott's oncologist allegedly told her that it was not necessary for her to arrange for alternate transportation following her October 30 chemotherapy session, and that she could drive herself home "if she felt OK." *Id.*

On October 29, 1998, Mrs. Wiscott arrived at WRAMC to have a "PICC line" inserted in her arm so that medications could be administered intravenously during her chemotherapy treatment the next day. *Id.* Mrs. Wiscott allegedly was again informed by the staff at WRAMC on that date that she could drive her car home after her chemotherapy treatment on October 30. *Id.; see also* Wiscott Dep. (August 21, 2000) at 37.

Mrs. Wiscott received her chemotherapy treatment at WRAMC on October 30, including, via intravenous infusion, the drugs ativan and zofran. *See* Pls.' Opp., Ex. F. Following her treatment, Mrs. Wiscott's oncologist told her to go home. Wiscott Dep. (August 21, 2000) at 38–40. No one warned Mrs. Wiscott not to drive or asked how she was going to return to her home. *Id.* at 39. Although she had previously planned to take a bus home from the hospital, Mrs. Wiscott believed that she had medical approval to drive. *Id.* at 40.[1] Ac-

---

1. Ms. Wiscott contends that, had she been told by any WRAMC staff not to drive home,

cordingly, she proceeded to drive her vehicle toward her home in Gambrills, Maryland, located about forty miles from the hospital. Compl. ¶¶ 9, 10.

Mrs. Wiscott ultimately blacked out and lost control of her vehicle, causing it to cross into the opposite lane of traffic. *See* Compl. ¶ 10; Wiscott Dep. (August 21, 2000) at 65. Mrs. Wiscott's vehicle collided with a vehicle in which Marie Rosalind Salcedo Hoehn and Victoria Hoehn were passengers. *Id.* ¶ 10.

As a result of the accident, Marie Hoehn sustained a traumatic brain injury. *Id.* ¶ 12. She is permanently impaired, mentally and physically, is confined to a wheelchair, and is unable to walk, feed herself, or control her bowel or bladder. *Id.* Victoria Hoehn, her minor daughter, sustained relatively minor physical injuries from which she has recovered. However, she allegedly continues to suffer from serious emotional trauma as a result of the accident. *Id.* ¶ 13; *see also* Pls.' Ex. B.

Marie Hoehn (by her co-guardians), individually and on behalf of Victoria Hoehn, and Gary Hoehn, on behalf of his daughter Victoria Hoehn, have brought this complaint against the United States under the FTCA, 28 U.S.C. §§ 2671 *et seq.*, alleging that WRAMC negligently (1) failed to prohibit Mrs. Wiscott from driving her motor vehicle, (2) failed to suggest alternate transportation for her, and (3) permitted Mrs. Wiscott to drive her motor vehicle. Compl. ¶ 11. Marie Hoehn seeks damages in the amount of fifteen million dollars, and Victoria Hoehn seeks damages in the amount of one million dollars.

Defendant, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, has moved to dismiss the complaint, in part, for lack of subject matter jurisdiction. In addition, pursuant to Rules 12(b)(6) and 56 of the Federal Rules of Civil Procedure, defendant has moved for summary judgment for failure to state a claim upon which relief may be granted.[2]

## ANALYSIS

### I. Lack of Subject Matter Jurisdiction

Defendant presents two arguments concerning subject matter jurisdiction. First,

---

she would have followed the instructions. Wiscott Dep. (August 21, 2000) at 39.

2. Although little discovery has been conducted in this case to date, each party relies in part upon items outside of the pleadings to support of its position. Defendant's jurisdictional motion shall be treated as a motion to dismiss, despite the fact that the Court has considered, *inter alia*, the affidavit from plaintiffs' counsel. *See Herbert v. Nat'l Academy of Sciences*, 974 F.2d 192, 197 (D.C.Cir.1992); *Farrero v. Nat'l Aeronautics & Space Admin.*, 180 F.Supp.2d 92, 95 (D.D.C.2001) ("the court may consider such materials outside the pleadings as it deems appropriate to determine whether it has jurisdiction in the case").

Defendant's motion to dismiss for failure to state a claim shall, pursuant to Fed.R.Civ.P. 12(b), be treated as a motion for summary judgment under Rule 56 because the Court has not excluded the depositions and other items submitted by the parties. Summary judgment is, of course, appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court notes that its reliance upon items outside of the pleadings in considering defendant's 12(b)(6) motion has been minimal, and mostly for the purposes of elaborating upon the complaint and providing context for the discussion herein. The question presented is fundamentally legal in nature, and defendant does not purport to be disputing, for the purposes of this motion at least, the factual bases for plaintiffs' complaint. As indicated in Part II below, the Court anticipates that there may be further filing of dispositive motions as factual and expert discovery progresses.

defendant contends that Marie Hoehn failed to present a proper administrative claim. Second, defendant argues that, in the event that the Court finds that an administrative claim was properly presented, any damages Marie Hoehn seeks in excess of those sought in the administrative claim should be dismissed or struck.

## A. Failure to Present an Administrative Claim

In its moving papers, defendant contends that Marie Hoehn did not present a proper administrative claim because Gary Hoehn apparently signed the administrative form, Standard Form 95 ("SF–95"), on Marie Hoehn's behalf, and was not authorized to do so under the FTCA. Def.'s Mot. to Dismiss at 4–5. Plaintiffs, in response, have submitted an affidavit from their attorney, Michael Abelson, explaining that he signed the SF–95 with Marie Hoehn's name on her behalf, and then added his initials, along with those of Gary Hoehn. Aff. of Michael A. Abelson (executed September 19, 2001). In its reply, defendant does not dispute plaintiffs' account of the events, but questions how Marie Hoehn could have authorized Mr. Abelson to sign for her when she was allegedly reduced to "vegetative functioning." [3] Def.'s Reply at 1–2.

■ Proper presentation of an administrative claim is, of course, mandatory before an action may proceed under the FTCA. *See* 28 U.S.C. § 2675(a). A claim is properly presented if the injured person, his duly authorized agent, or legal representative signs the SF–95 or other written demand. 28 C.F.R. § 14.3(b); *see also Odin v. United States,* 656 F.2d 798, 804 n.

22 (D.C.Cir.1981). Here, the only evidence before the Court is that Mr. Abelson signed the SF–95 upon authorization from his client, Marie Hoehn. Defendant has presented little more than conjecture that the authorization was improper. Accordingly, the Court finds that Marie Hoehn's administrative claim was properly presented.

## B. Excess Damages

Defendant also moves to dismiss or strike Marie Hoehn's demand for damages in excess of ten million dollars on the ground that such damages are beyond the sum stated in plaintiffs' administrative claim. Under 28 U.S.C. § 2675(b), a plaintiff may amend the sum of damages requested in an SF–95 in only two situations:

■ where the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or [2] upon allegation and proof of intervening facts, relating to the amount of the claim.

28 U.S.C. § 2675(b); *Husovsky v. United States,* 590 F.2d 944, 954 (D.C.Cir.1978). The burden is on the claimant to prove that either exception is applicable. *Allgeier v. United States,* 909 F.2d 869, 877 (6th Cir.1990); *Kielwien v. United States,* 540 F.2d 676, 680 (4th Cir.1976).

■ Here, counsel for plaintiffs concedes that at the time he filed the SF–95 with a damages claim of ten million dollars, he "had. not yet assessed the full remedies required to mitigate the damages." Pls.' Opp. at 9. This failure, he asserts, "was in part due to Marie's slow recovery out of critical condition." *Id.* The

---

**3.** Defendant also suggests that because co-guardians were appointed to look after Marie Hoehn's interests, the co-guardians should have signed for her on the SF–95. However, the SF–95 was signed by May 2000, and co-guardians were not appointed until June 2001. Hence, they could not have signed the SF–95 on behalf of Marie Hoehn at the time it was submitted.

revised damages claim of fifteen million dollars was made only after discussions with newly appointed co-guardians who had determined that the higher amount would be necessary to compensate Marie Hoehn during the course of her lifetime. *Id.*

These factors are insufficient to demonstrate entitlement to an exception under section 2675(b). Taking the second exception first, plaintiffs have not even alleged, much less proven, that there are "intervening facts" that have modified Marie Hoehn's prognosis since the filing of the SF–95. This is not a case like *Husovsky,* in which the D.C. Circuit concluded that there were "intervening facts" warranting an increase in the damages because a treating physician had testified that unexpected improvements in plaintiff's health had extended the prognosis for plaintiff's life expectancy. 590 F.2d. at 954. No such evidence has been proffered here.

With respect to the first exception, Marie Hoehn's only colorable argument is that counsel's failure to conduct an assessment as to her expected damages before filing the SF–95 was due "in part" to her alleged slow recovery. But Marie Hoehn has submitted no materials evidencing that alleged slow recovery or how it might have impeded her counsel (or the treating physicians) from ascertaining through due diligence the full scope of her injuries. Thus Marie Hoehn falls far short of showing that the increased amount of damages claimed in the complaint was based upon evidence "newly discovered" by the co-guardians that could not have been "reasonably discovered" earlier. Accordingly, Marie Hoehn's claim for damages will be restricted to the ten million dollars sought in the SF–95, and the demand for damages above that amount in the complaint will be stricken.

## II. Failure to State a Claim Upon Which Relief Can be Granted

In their complaint, plaintiffs charge that WRAMC "negligently deviated from reasonable and minimal standards of medical care by: (1) failing to prohibit Mrs. Wiscott from driving her motor vehicle, (2) failing to suggest alternate transportation for her, and (3) permitting Mrs. Wiscott to drive her motor vehicle." Compl. ¶ 11. Defendant argues that the complaint fails to state a claim upon which relief can be granted because WRAMC owes no duty to the general public to prevent heavily medicated and/or sedated patients from operating a motor vehicle.

■ The important question of whether a hospital owes a duty to the general public in circumstances such as these is undecided in the District of Columbia. Although this question might be most appropriately addressed by the District of Columbia's own courts,[4] this Court does not have authority to certify a question to the District of Columbia Court of Appeals. *See* D.C.Code § 11–723(a) ("The District of Columbia Court of Appeals may answer questions of law certified to it by the Supreme Court of the United States, a Court of Appeals of the United States, or the highest appellate court of any State"); *see also 3307 M St. Partners v. Commonwealth Land Title Ins. Co.,* 782 F.Supp. 4, 6 (D.D.C.1992) (discussing

---

4. Federal courts facing similar issues of physician or hospital liability to third parties have elected to certify questions to the appropriate state court. *See, e.g., McKenzie v. Hawai'i Permanente Medical Grp., Inc.,* 98 Hawai'i 296, 47 P.3d 1209, 1209 (2002) (certified

question from U.S. District Court for the District of Hawaii); *Lester v. Hall,* 126 N.M. 404, 970 P.2d 590, 590 (1998) (certified question from the U.S. District Court for the District of New Mexico).

the legislative history concerning the exclusion of the United States District Courts from D.C.Code § 11–723). Accordingly, this Court must resolve the pending issue as it believes the District of Columbia Court of Appeals would. *See Thomas v. City Lights Sch., Inc.*, 124 F.Supp.2d 707, 709 (D.D.C.2000) (citing Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure Civil 2d § 4507 at p. 130 (1996), and *Indep. Petrochem. Corp. v. Aetna Cas. and Sur. Co.*, 944 F.2d 940, 944 (D.C.Cir.1991)).

 Under District of Columbia law, whether a duty is owed is a question of law to be determined by the court. *Settles v. Redstone Development Corp.*, 797 A.2d 692, 695 (D.C.2002); *In re Sealed Case*, 67 F.3d 965, 968 (D.C.Cir.1995). Such a determination should be made " 'by reference to the body of statutes, rules, principles, and precedents.' " *In re Sealed Case*, 67 F.3d at 968 (quoting Prosser & Keeton on the Law of Torts § 37 at 236 (5th ed.1984)). The court should consider the foreseeability of the harm "based on the recognition that duty must be limited to avoid liability for unreasonably remote consequences." *City Lights*, 124 F.Supp.2d at 709 (quoting *W.C. & A.N. Miller Cos. v. United States*, 963 F.Supp.

1231, 1243 (D.D.C.1997)). But " 'whether a duty exists is not simply a question of foreseeability. [It] is … a question of fairness … [and] involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution.' " *Id.* (quoting *Knippen v. Ford Motor Co.*, 546 F.2d 993, 1000 (D.C.Cir.1976)). "The existence of a duty … results ultimately from policy decisions made by the courts and the legislatures." *Williams v. Baker*, 572 A.2d 1062, 1064 (D.C.1990).

Although not explicitly framed as such in the complaint, the Court believes that there are two analytically distinct theories of duty relevant here: (1) an alleged duty owed by WRAMC to unidentified third parties to **control** a heavily medicated patient and, specifically, to prevent her from driving an automobile upon discharge or release; and (2) an alleged duty owed by WRAMC to unidentified third parties to **warn** a heavily medicated patient about the dangers of driving upon release. The Court will consider each theory of duty in turn.[5]

## A. Duty to Control

It is clear enough that there is no general duty in tort law "to control the conduct

---

5. Some courts, on facts similar to those presented here, do not draw a clear distinction between the "duty to control" and the "duty to warn." Rather, their analyses suggest that, in the absence of a physician's duty or ability to control a patient, there is no duty to warn that runs to third parties. *See Conboy v. Mogeloff*, 172 A.D.2d 912, 912–13, 567 N.Y.S.2d 960 (1991) (examining physician liability to third parties for failing to direct patient not to drive by analyzing whether physician had ability or authority to control patient's conduct); *Calwell v. Hassan*, 260 Kan. 769, 925 P.2d 422, 430–32 (1996) (examining issue concerning "duty to warn" by analyzing whether there was a "duty to control" under Restatement (Second) Torts § 315(a)). The Court concludes that members of the public may be owed a duty to warn even when there is no "control" over, or "duty to control," the patient—for example, in some outpatient settings—and hence finds more instructive the reasoning of cases noting that the absence of "control" is not a bar to a duty to warn. *See, e.g. Praesel v. Johnson*, 967 S.W.2d 391, 398 (Tex.1998) ("All parties and the court of appeals have recognized that none of the physicians had the right or ability to control the conduct of Peterson.... But it does not necessarily follow that there is no duty to give a warning."); *Wilschinsky v. Medina*, 108 N.M. 511, 775 P.2d 713, 715–18 (1989) (concluding that there was no "patient control" under the facts of the case, but holding that there was, nevertheless, a duty owed to injured third parties).

of a third person as to prevent him from causing physical harm to another." Restatement (Second) Torts § 315 (1965); *see also Skeen v. Federative Republic of Brazil*, 566 F.Supp. 1414, 1419 (D.D.C.1983). An exception exists, however, where there is a "special relation" between either the actor (here, WRAMC) and the third person (here, Mrs. Wiscott) or the actor and others (here, plaintiffs). Restatement (Second) Torts § 315. The parties center their arguments around the "special relation" implicit in Section 319 of Restatement (Second) Torts: [6]

> § 319. Duty of Those in Charge of Person Having Dangerous Propensities.
>
> One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

As explained in the comments to Section 319, the duty to control persons with "Dangerous Propensities" applies in two situations. First, there may be a duty to control a person who is "of a class of persons to whom the tendency to act injuriously is normal." *Id.* § 319, cmt. a. Second, a duty may exist when the person has a "peculiar tendency" to act injuriously and the actor should know of this tendency. *Id.* In either case, the duty applies only where one "takes charge of a third person." *Id.* § 319.

The parties refer the Court to two cases in this Circuit that have interpreted and applied Section 319. *See White v. United States*, 780 F.2d 97 (D.C.Cir.1986); *City Lights*, 124 F.Supp.2d at 707. In *White*, the D.C. Circuit considered an appeal by the wife of a criminally insane patient at St. Elizabeth's Hospital who had attacked

her when he "escaped" from grounds privileges after relating a violent fantasy to a psychologist at the hospital. The court, emphasizing that the D.C.Code imposes a presumption of dangerousness upon patients who have been acquitted by reason of insanity, held that a hospital which is the custodial ward of criminally insane patients owed to a third-party plaintiff a duty to "take steps to prevent the escape of dangerous patients." *White*, 780 F.2d at 103.

In *City Lights*, Judge Harris of this court considered whether a school for "at-risk" students owes a duty to the general public to control its students on a field trip. *See* 124 F.Supp.2d at 708. On defendant's motion to dismiss, the court held that under Section 319 the school would owe a duty to the general public to protect against foreseeable harm if the school took charge of its students, the students were likely to cause bodily harm to others if not controlled, and the school knew or should have known of the students' propensity to cause bodily harm. *Id.* at 712. The court relied upon a New Jersey case that noted the propensity of school children on a field trip to " 'act impulsively without thought of the possibilities of danger.' " *Id.* at 711 (quoting *Desilets v. Clearview Regional Bd. of Ed.*, 265 N.J.Super. 370, 627 A.2d 667, 672–73 (1993)).

■ The facts of the instant case are significantly different than those in *White* and *City Lights*. The court in *White* emphasized that the patient inmate was presumed dangerous under statutory law and the court in *City Lights* noted the tendency for mischief by the students at issue. Here there is absolutely nothing to indicate that Mrs. Wiscott—who is not alleged to have any criminal history or mental

---

**6.** The other special relations identified in the Restatement do not appear to be relevant

here. *See id.* § 315, cmt. c, and §§ 314A, 316–320.

illness—ordinarily had dangerous propensities within the meaning of Section 319. Moreover, even if the relevant question is whether Mrs. Wiscott had dangerous propensities when heavily medicated, the answer is still that she did not. A heavily medicated individual is not of a "class of persons to whom the tendency to act injuriously is normal." Nor does such a person have a " 'peculiar tendency' " to harm others. *See* Restatement (Second) of Torts § 319, cmt. a. The fact that Mrs. Wiscott decided to drive when medicated may have created a dangerous situation. But such happenstance does not compel the conclusion that medicated patients in general are inherently dangerous, like criminally insane patients or "at-risk" students on a field trip.[7]

The Court also finds that WRAMC had not "take[n] charge" of Mrs. Wiscott within the meaning of Section 319. Whereas the *City Lights* students were plainly in the custody of their school and the patient in *White* was committed to a mental institution, Mrs. Wiscott was merely a voluntary outpatient scheduled for brief treatment at a large medical center. The hospital had no right or ability to control her.

Notably, the highest court of Maryland, which the D.C. Court of Appeals finds persuasive on matters of first impression,[8]

has emphasized that only custodial circumstances give rise to a duty to control under Section 319. *See Lamb v. Hopkins,* 303 Md. 236, 492 A.2d 1297, 1301 (1985) (Section 319 has "peculiar application to custodial relations" (citing Prosser & Keeton on the Law of Torts § 56 & n. 16, at 383, for proposition that the relationships discussed in § 319 are "custodial by nature")); *see also Nasser v. Parker,* 249 Va. 172, 455 S.E.2d 502, 506 (1995) ("taking charge" under Section 319 requires a "higher degree of control over the patient than exists in an ordinary doctor-patient relationship or hospital-patient relationship"); *Wilschinsky,* 775 P.2d at 715 (where medication was administered to outpatient in doctor's office, the facts do not "raise an issue of patient control"). Indeed, the imposition of a duty under the instant circumstances could be extremely burdensome to hospitals generally, as they might be driven to extend hospital stays beyond what is medically necessary, or attempt to develop rigorous controls in an effort to prevent patients who receive sedatives from driving. *See Praesel,* 967 S.W.2d at 398 ("it would be very difficult for someone to prevent another from driving in an impaired condition").

Accordingly, the Court concludes that under the circumstances of brief outpatient

**7.** Plaintiffs rely upon *Tarasoff v. Regents of the Univ. of Cal.,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976), for the proposition that there is a "special relationship" in the instant case. *Tarasoff,* however, involved a psychiatric patient who had expressly informed his therapist of his intention to kill a particular person. Accordingly, that case presented a much stronger basis for finding that the patient was dangerous, and additionally presented a readily identifiable potential victim to be warned or protected, unlike the situation here, where any duty would run to unidentifiable third parties.

**8.** *See Walker v. Indep. Fed. Sav. & Loan Ass'n,* 555 A.2d 1019, 1022 (D.C.1989) ("In the ab-

sence of appellate or other authority in this jurisdiction, the Court may be guided by Maryland common law."); *Napoleon v. Heard,* 455 A.2d 901, 903 (D.C.1983) (Maryland is "the source of the District's common law and an especially persuasive authority when the District's common law is silent"); *Conesco Industries, Ltd. v. Conforti & Eisele, Inc.,* 627 F.2d 312, 315–16 (D.C.Cir.1980) (looking to Maryland law "because the District of Columbia derives its common law from that state and because District of Columbia courts have in the past looked to Maryland law for guidance").

care presented here, WRAMC owed no duty to unidentified third parties to control Mrs. Wiscott and prevent her from driving upon release. Defendant is entitled to judgment as a matter of law insofar as plaintiffs' claim is based upon such a duty to control.

## B. Duty to Warn

The more compelling question presented by the complaint is whether WRAMC owed a duty to unidentified third parties to warn Mrs. Wiscott not to drive upon release following her chemotherapy treatment. According to plaintiffs, two of the drugs received intravenously by Mrs. Wiscott during her treatment, ativan and zofran, have adverse effects on driving ability. *See* Pls.' Opp. at 2. Specifically, the Physician's Desk Reference warns that a patient receiving ativan should not operate a motor vehicle for 24 to 48 hours afterwards, and that patients (like Mrs. Wiscott) over the age of 50 may have a profound and prolonged sedation. *See id.* at 2 n. 2. Likewise, the Physician's Desk Reference states that zofran may cause transient dizziness after infusion. *See id.* Plaintiffs contend that because WRAMC allegedly failed to caution Mrs. Wiscott that she should refrain from driving after she received ativan and zofran, WRAMC violated a "duty ... to the driving public to warn its heavily medicated and/or sedated patient about the dangers of driving home after her first chemotherapy session." Pls.' Opp. at 15.

This "duty to warn" issue is a novel one in the District of Columbia. Nevertheless, the Court is not entirely without guidance in considering the question, as courts in several states have addressed similar issues. These courts, however, are divided on whether a doctor or hospital is liable to members of the general public who are allegedly injured as a result of a doctor's or hospital's failure to warn a patient not to drive. *Compare, e.g., McKenzie,* 47 P.3d at 1221 (under Hawaii law, physicians owe a duty for the benefit of third parties to advise patients that a medication may affect driving ability when such a duty would otherwise be owed to the patient), *Wilschinsky,* 775 P.2d at 717 (under New Mexico law, physicians owe a duty "to persons injured by patients driving automobiles from a doctor's office when the patient has just been injected with drugs known to affect judgment and driving ability"), *Myers v. Quesenberry,* 144 Cal. App.3d 888, 893, 193 Cal.Rptr. 733 (Cal.Ct. App.1983) (under California law, "where warning the actor is a reasonable step to take in the exercise of the standard of care applicable to physicians ..., liability is not conditioned on potential victims being readily identifiable as well as foreseeable"), *and Kaiser v. Suburban Transp. Sys.,* 65 Wash.2d 461, 398 P.2d 14, 16 (1965) (on claim by injured bus passenger, doctor's alleged negligence in failing to warn patient-bus driver that a drug could cause drowsiness was question for jury), *with Praesel,* 967 S.W.2d at 398 (physicians do not owe duty to third parties to warn an epileptic patient not to drive under Texas law), *Calwell,* 925 P.2d at 432 (under Kansas law, physician owed no duty to injured bicyclists to warn sleep disorder patient of dangers of falling asleep while driving), *Conboy,* 172 A.D.2d at 912–13, 567 N.Y.S.2d 960 (under New York law, physician owed no duty to passengers injured in car driven by patient for whom physician had prescribed medication having a sedative effect), *and Kirk v. Michael Reese Hosp. & Med. Ctr.,* 117 Ill.2d 507, 111 Ill.Dec. 944, 513 N.E.2d 387, 397 (1987) (neither physician nor hospital owed duty to third-party non-patients to warn patient of effects of prescription drugs). Here, moreover, this Court lacks the benefit of defendant's position on the persuasiveness of these cases, as defendant—apparently

interpreting plaintiffs' complaint as raising primarily a "duty to control" issue—has provided in its briefs almost no discussion as to whether a "duty to warn" should apply.[9]

In several of the cases cited above, the courts reached their decisions upon review of a substantial record after discovery. *See, e.g., McKenzie,* 47 P.3d at 1211 (record included expert report or testimony); *Wilschinsky,* 775 P.2d at 714 (record included depositions relating to effects of drugs at issue on a person's ability to drive); *Calwell,* 925 P.2d at 426–27 (record included depositions of medical experts). Here, in contrast, the parties have not submitted factual evidence or expert opinions concerning, for example, the sedative or other effects of ativan and zofran, and whether it is standard practice in the medical community to warn patients not to drive after receiving these or other medications. Indeed, other than the passing references to the Physicians' Desk Reference provided in plaintiffs' brief, the Court lacks any information about the potential effects on driving ability that WRAMC could have anticipated would be caused by Mrs. Wiscott's treatment. In the absence of a more complete record, it is difficult for the Court to make the delicate assessments regarding, *inter alia,* foreseeability, fairness, and public policy concerns [10] that are necessary in order to resolve whether, as a matter of District of Columbia law, WRAMC owed a duty to plaintiffs to warn Mrs. Wiscott under the circumstances.

■ Given the unsettled law in the District of Columbia, the failure of the parties to provide a fulsome discussion concerning the alleged duty to warn, and the sparse state of the factual record, the Court is not persuaded that the complaint should be dismissed for failure to state a claim or that summary judgment should be entered in favor of defendant. On the duty to warn issue, at this stage of the case, it appears that the complaint **may** plead a viable theory of negligence for breach of a duty to warn.[11] After further development of the factual record and appropriate expert discovery, defendant will have another opportunity to challenge plaintiffs' claim on a motion for summary judgment.

## CONCLUSION

Plaintiff Marie Hoehn submitted a proper administrative claim through her coun-

9. Indeed, to the extent that defendant even addresses a "duty to warn," it is only to suggest that although some courts have recognized a "duty to warn," plaintiffs' complaint does not raise such issues. *See* Def.'s Mem. at 11. The Court disagrees. Plaintiffs' allegation that WRAMC negligently "fail[ed] to suggest alternate transportation" for Mrs. Wiscott, *see* Complaint ¶ 11, is essentially an allegation that WRAMC should have warned Mrs. Wiscott not to drive, as plaintiffs have now made clear.

10. The parties have thus far failed to identify any legislative enactment in the District of Columbia that may provide guidance concerning the public policy issues implicated by this case. *Cf. Kirk,* 111 Ill.Dec. 944, 513 N.E.2d at 396–97 (examining Illinois medical malpractice law in determining whether public policy favors holding hospital liable for acts committed by patients who have recently been released).

11. The Court notes that, although it has tracked plaintiffs' complaint by analyzing whether a duty to warn runs to the "public," Compl. ¶ 8, other courts—even when finding that a duty to warn runs to non-patient third parties—have declined to extend a duty to the "entire public." *See, e.g., Wilschinsky,* 775 P.2d at 716 (Duty to warn "is not to the entire public for injuries suffered for which an argument of causation can be made. The duty specifically extends to persons injured by patients driving automobiles from a doctor's office when the patient has just been injected with drugs known to affect judgment and driving ability."). The Court need not in the context of the present motion determine the precise class of non-patient third parties to whom a duty may be owed.

sel. Because the administrative claim sought only ten million dollars in damages, however, Marie Hoehn may not now seek greater damages.

With regard to the substance of the complaint, the Court finds that WRAMC had no duty to plaintiffs to control Mrs. Wiscott. Accordingly, defendant's motion for summary judgment is granted to the extent that plaintiffs' complaint is based on a theory that WRAMC owed a duty to plaintiffs to prevent Mrs. Wiscott from driving. Defendant's motion for summary judgment is denied, however, insofar as plaintiffs allege that WRAMC owed to plaintiffs a duty to warn Mrs. Wiscott not to drive after receiving the chemotherapy and accompanying treatments at issue. At this time, the Court has an insufficient basis to conclude that no such duty was owing to plaintiffs.

A separate order has been issued on this date.[12]

### *ORDER*

Upon consideration of Defendant's Motion to Dismiss, in Part, and for Summary Judgment, the submissions of the parties, and the entire record, it is hereby ORDERED as follows.

1. For the reasons stated in the Memorandum Opinion issued on this date, defendant's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) is DENIED in part and GRANTED in part. Plaintiff Marie Hoehn may continue to pursue her claim, but her demand for damages in excess often millions dollars is dismissed and struck.

2. For the reasons stated in the Memorandum Opinion issued on this date, defendant's motion to dismiss pursu-

ant to Rule 12(b)(6) and for summary judgment pursuant to Rule 56 is GRANTED to the extent that plaintiffs' complaint is based on a theory that WRAMC owed a duty to plaintiffs to prevent Emiko Wiscott from driving ("duty to control").

3. For the reasons stated in the Memorandum Opinion issued on this date, defendant's motion to dismiss pursuant to Rule 12(b)(6) and for summary judgment pursuant to Rule 56 is DENIED WITHOUT PREJUDICE TO RENEWAL to the extent that plaintiffs' complaint is based on a theory that WRAMC owed a duty to plaintiffs to warn Emiko Wiscott not to drive after receiving the chemotherapy and accompanying treatments at issue ("duty to warn").

---

**12.** After defendant files its answer to the complaint, the Court will issue an order setting a date for the initial scheduling conference in this matter pursuant to LCvR 16.4.